# FOR PUBLICATION



FILED
Oct 24 2013, 5:23 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**STEVEN H. SCHUTTE**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KELLY A. MIKLOS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| GREGORY DICKENS, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1304-PC-101 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Jane Woodward Miller, Judge
Cause No. 71D01-0208-PC-29

**October 24, 2013**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

**CASE SUMMARY**

Appellant-Petitioner Gregory Dickens was convicted of murdering a police officer while the officer was engaged in his official duties. Dickens's conviction was affirmed by the Indiana Supreme Court on direct appeal. Dickens sought post-conviction relief, arguing, *inter alia*, that he was entitled to a new trial in light of newly discovered evidence, that he was entitled to a new trial because the State withheld evidence from the defense in violation of *Brady v. Maryland*,[1] and that he received ineffective assistance of trial counsel. Dickens now appeals from the denial of his petition for post-conviction relief. Concluding that Dickens was not entitled to a new trial in light of either the newly discovered evidence or the alleged *Brady* violation, and that Dickens did not receive ineffective assistance of trial counsel, we affirm.

**FACTS AND PROCEDURAL HISTORY**

The Indiana Supreme Court's opinion in Dickens's direct appeal instructs us as to the underlying facts leading to this post-conviction appeal:

> On August 24, 1997, sixteen-year-old Dickens was riding bikes with Quinton Price, known as "Paulie." While patrolling the area, Officer Scott Hanley advised Corporal Paul Deguch by radio that Dickens was riding a valuable bicycle that he suspected was stolen. Later on that evening, Deguch spotted Dickens and Paulie and approached them in his patrol car. Paulie rode off, while Dickens rode up to the nearest house, 1024 Talbot Street, alighted from the bike, and went up on the porch. Deguch shined his spotlight onto the porch, exited his car, and followed Dickens onto the porch as Dickens was knocking on the door. Dickens shot Corporal Deguch in his head and shoulder and killed him.
>    The State charged Dickens with murder and sought the death penalty because the victim was a law enforcement officer. A jury found Dickens

---

[1] 373 U.S. 83 (1963).

2

guilty, and recommended life imprisonment without parole, which the trial court imposed.

*Dickens v. State*, 754 N.E.2d 1, 3-4 (Ind. 2001). The Indiana Supreme Court affirmed Dickens's conviction on direct appeal. *Id*. at 4-7.

On August 26, 2002, Dickens filed a *pro se* petition for post-conviction relief ("PCR"). On November 22, 2011, March 6, 2012, August 3, 2012, and November 15, 2012, Dickens, by counsel, filed amended PCR petitions. The post-conviction court conducted a two-day evidentiary hearing on Dickens's last amended PCR petition on December 18 and 19, 2012. During this hearing, Dickens, by counsel, presented argument in support of his amended PCR petition. On March 4, 2013, the post-conviction court issued an order denying Dickens's request for PCR.

## DISCUSSION AND DECISION

Post-conviction procedures do not afford the petitioner with a super-appeal. *Williams v. State*, 706 N.E.2d 149, 153 (Ind. 1999). Instead, they create a narrow remedy for subsequent collateral challenges to convictions, challenges which must be based on grounds enumerated in the post-conviction rules. *Id*. A petitioner who has been denied post-conviction relief appeals from a negative judgment and as a result, faces a rigorous standard of review on appeal. *Dewitt v. State*, 755 N.E.2d 167, 169 (Ind. 2001); *Collier v. State*, 715 N.E.2d 940, 942 (Ind. Ct. App. 1999), *trans. denied*.

Post-conviction proceedings are civil in nature. *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002). Therefore, in order to prevail, a petitioner must establish his claims by a

preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Stevens*, 770 N.E.2d at 745. When appealing from the denial of a PCR petition, a petitioner must convince this court that the evidence, taken as a whole, "leads unmistakably to a conclusion opposite that reached by the post-conviction court." *Stevens*, 770 N.E.2d at 745. "It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that its decision will be disturbed as contrary to law." *Godby v. State*, 809 N.E.2d 480, 482 (Ind. Ct. App. 2004), *trans. denied*. The post-conviction court is the sole judge of the weight of the evidence and the credibility of the witnesses. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004). We therefore accept the post-conviction court's findings of fact unless they are clearly erroneous but give no deference to its conclusions of law. *Id*.

## I. Newly Discovered Evidence

Dickens contends that the post-conviction court erroneously determined that he was not entitled to a new trial in light of certain newly discovered evidence. Specifically, Dickens argues that a report issued by the National Research Counsel ("NRC"), which was completed in 2004, established that the previously accepted and relied upon comparative bullet lead analysis ("CBLA") conducted by the FBI was unreliable. As such, Dickens claims that the newly discovered NRC report was relevant and would warrant a new trial because it would render inadmissible FBI forensic examiner Charles Peters's testimony about the CBLA conducted on the spent bullets recovered from the crime scene and the unspent

4

bullets found in Dickens's bedroom prior to Dickens's trial.[2]

The Indiana Supreme Court has enunciated nine criteria for admission of newly discovered evidence.

> [N]ew evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

*Taylor v. State*, 840 N.E.2d 324, 329-30 (Ind. 2006) (citing *Carter v. State*, 738 N.E.2d 665, 671 (Ind. 2000)) (brackets in original). On appeal, the denial of a petition predicated on newly discovered evidence is considered a discretionary ruling and is reviewed deferentially. *Fox v. State*, 568 N.E.2d 1006, 1007 (Ind. 1991) (citing *Hammers v. State*, 502 N.E.2d 1339 (Ind. 1987)). Accordingly, we analyze the nine factors "'with care, as the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized.'" *Taylor*, 840 N.E.2d at 330 (quoting *Carter*, 738 N.E.2d at 671). "The burden of showing that all nine requirements are met rests with the petitioner for post-conviction relief." *Id.* (citing *Webster v. State*, 699 N.E.2d 266, 269 (Ind. 1998)).

In the instant matter, Dickens does not dispute the post-conviction court's findings

---

[2] Peters testified that three of the bullets recovered from the crime scene were analytically indistinguishable from fourteen bullets from the box of ammunition found in Dickens's room, and that the fourth bullet from the crime scene matched the composition of the other six bullets in the box of ammunition found in Dickens's room. Peters opined that the victim associated bullets came from the box of ammunition or from any of the other boxes of ammunition that were produced at that same time.

regarding the first eight requirements.[3] Dickens merely argues that the post-conviction court erroneously determined that the NRC report would not produce a different result at retrial. As such, we will limit our review on appeal to this final requirement.

"In ruling whether a piece of evidence would produce a different result, the judge may properly consider the weight that a reasonable trier of fact would give it and, while so doing, may also evaluate its probable impact on a new trial in light of all the facts and circumstances shown at the original trial of the case." *Fox*, 568 N.E.2d at 1007. "The defendant must raise a strong presumption that the result at any subsequent trial in all probability would be different." *Bunch v. State*, 964 N.E.2d 274, 296 (Ind. Ct. App. 2012), *reh'g denied*, *trans. denied*. "A sufficient probability of a different result upon retrial is present where the omitted evidence creates a reasonable doubt that did not otherwise exist." *Fox*, 568 N.E.2d at 1008.

The post-conviction court found that in light of the findings contained in the NRC report, Peters's testimony regarding the CBLA would not likely be admissible at retrial. Although the exclusion of the CBLA evidence might have weakened the State's case, Dickens has not shown that the exclusion of the CBLA evidence, without more, would make it probable that a different result would be produced at retrial. As the post-conviction court noted, the CBLA evidence did not place Dickens on the porch at the time Corporal Deguch

---

[3] Regarding the first eight requirements, the post-conviction court found that the findings contained in the NRC report were discovered since Dickens's trial, the NRC report is relevant, the NRC report is not cumulative of evidence presented at trial, the NRC report is not "merely impeaching," the NRC report is not privileged, Dickens's trial counsel exercised due diligence as the NRC report could not have been discovered prior to trial, the CBLA critique contained in the NRC report is worthy of credit, and the NRC report could be reproduced at retrial.

6

was shot, eyewitness testimony did.

The essential elements of the State's case were established through eyewitness testimony. Myron Crawford and Rufus Tate each testified that they saw Dickens on the porch with Corporal Deguch at the time of the shooting. Neither Crawford nor Tate saw anyone else on the porch. At the time of the shooting, Crawford was with his sister, Lolita Lewis, and a friend inside the house that is connected to the porch where Corporal Deguch was shot. Tate was sitting on the porch of his residence across the street from the porch where Corporal Deguch was shot.

After Corporal Deguch followed Dickens onto the porch, Crawford saw Dickens turn toward Corporal Deguch and raise his hand. Crawford then heard four gunshots and saw a flash coming from Dickens's hand. Crawford testified that Dickens appeared to be standing "right in front of" Corporal Deguch approximately two or three feet from Corporal Deguch at the time that Corporal Deguch was shot. Trial Tr. p. 2575. After being shot, Corporal Deguch fell forward against Dickens who "pushed him up off him." Trial Tr. p. 2575.

Tate also heard something that "sounded like firecrackers" and saw "some flashes." Trial Tr. p. 2526. Lewis also heard gunfire. After hearing gunfire, Lewis looked out onto the porch. Lewis saw Dickens run from the stairs at the bottom of the porch. Each of these witnesses testified that they knew Dickens prior to the shooting and provided a similar description of the clothing that Dickens was wearing at the time of the shooting. Moreover, the record is devoid of any suggestion that any of the eyewitnesses had any motive to fabricate their testimony.

The State also presented evidence at trial of Dickens's actions immediately following the shooting. After shooting Corporal Deguch, Dickens ran to his cousin's home. Dickens's cousin lived nearby. Upon arriving at his cousin's home, Dickens appeared anxious to get inside the home and would not answer any questions. Consistent with the description of Dickens's clothing given by Crawford, Lewis, and Tate, Dickens was wearing a black hooded sweater. Dickens later told his cousin that Corporal Deguch had been shot. During a subsequent search of Dickens's cousin's home, investigators recovered the clothing that Dickens was wearing at the time of the shooting, including the black hooded sweater.

Dickens testified at trial that he did not shoot Corporal Deguch. Dickens admitted that he was on the porch but claimed that Shawn Bailey shot Corporal Deguch three or four times as Corporal Deguch began to search Dickens. Bailey, however, denied any involvement in the shooting and had an alibi for his whereabouts at the time of the shooting. Bailey's alibi was corroborated by another witness.

In addition, the unchallenged forensic evidence demonstrated that all four of the bullets recovered from the crime scene were shot from the same firearm; that the bullets' design, weight, and caliber were consistent with .38 caliber ammunition manufactured by Remington; and that a box of ammunition matching that description was found in Dickens's bedroom. Dr. Kristen Jacobs, a pathologist with the South Bend Medical Foundation, conducted an autopsy on Corporal Deguch's body. Dr. Jacobs testified that Corporal Deguch suffered four gunshot wounds, including gunshot wounds to the head, left side of the neck, right shoulder, and right forearm. Dr. Jacobs further testified that Corporal Deguch's autopsy

8

revealed "stippled marks in the skin where both burned and unburned powder residue that escape[d] from the gun when the bullet [was] shot landed on the skin and embedded on the skin." Trial Tr. p. 2749. Dr. Jacobs determined that the bullets entered Corporal Deguch's body from the front.

With respect to the gunshot wound to Corporal Deguch's head, Dr. Rick Hoover, a forensic pathologist with the South Bend Medical Foundation, testified that the gunshot wound to Corporal Deguch's head was shot from a "distance of between six and thirty-six inches at the time of discharge." Trial Tr. p. 2874. With respect to the gunshot wound to Corporal Deguch's shoulder, Dr. Hoover testified that the muzzle of the firearm used in the shooting was "touching the shoulder at the time of discharge." Trial Tr. p. 2877. Both the gunshot wound to the head and to the shoulder were fatal gunshot wounds.

Upon review, we conclude that the State provided overwhelming evidence of Dickens's guilt. In light of the overwhelming evidence of Dickens's guilt, we cannot say that exclusion of the CBLA evidence would "probably" produce a different outcome at retrial. *See Taylor*, 840 N.E.2d at 330. As such, we conclude that the post-conviction court did not err in determining that the newly discovered evidence did not entitle Dickens to a new trial.

## II. *Brady* Claim

Dickens also contends that the State withheld evidence relating the reliability of the CBLA evidence from his counsel prior to trial in violation of *Brady*. Specifically, Dickens argues that the State should have known that the reliability of the CBLA evidence was questionable, but failed to inform his trial counsel.

9

In [*Brady*], the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." [373 U.S. at 87]. To prevail on a *Brady* claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial. *Id.*; *United States v. Bagley*, 473 U.S. 667, 685, 105 S.Ct. 3375, 3385, 87 L.Ed.2d 481 (1985).

*Minnick v. State*, 698 N.E.2d 745, 755 (Ind. 1998). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

Dickens claims that the State should have known that there were questions relating to the reliability of the CBLA evidence and should have disclosed such information to his counsel prior to trial. In support, Dickens relies on the post-conviction testimony of Dr. Mark Lebeau, a senior forensic scientist at the FBI Laboratory in Quantico, Virginia. Dr. Lebeau testified that the FBI permanently discontinued CBLA in 2005 after receiving the 2004 NRC report. While Dr. Lebeau testified that he was not aware of any legal challenges to CBLA evidence prior to 2002, he further testified that the FBI conducted a study "in the early nineties that was confusing is the only way [to] put it." PCR Tr. p. 115. With respect to this study, Dr. Lebeau testified that:

We had an examiner grab two different boxes of bullets, packaged at different times, from the same manufacturer, out of our firearms collection at the lab. So they just randomly grabbed two boxes of maybe Winchester bullets, and they were analytically the same, and at the time the thought was, okay, either they had a repeat melt, or what had happened is, you know, this is a manufacturing process, and they don't necessarily, you know, they're putting these bullets in these big hoppers. They don't necessarily go down to the very

10

last bullet before they replace it.… So in our discussions with the manufacturer they said, well, that could very well be a reasonable explanation is that something just didn't get packaged for like a 10-month period. It was sitting at the bottom of the hopper, and finally, however they do it I don't know, is somebody reached in and grabbed the bottom and happened to throw some in. Now that's a possibility. The possibility is that it was a repeat melt. My opinion is it's probably a repeat melt, because what's the chance we just happened to pull two boxes off the shelf?

But so it was recognized as early as the early nineties that you could potentially have a repeat melt, but we really, based on the research we had done, other than this, we didn't think it was that high of a probability.

PCR Tr. pp. 115-16. In light of Dr. Lebeau's testimony, Dickens claims that the FBI, and by extension the State, should have known that there were questions regarding the reliability of CBLA evidence, and should have informed his trial counsel of these questions prior to trial.

Again, in order to prevail on a *Brady* claim, a petitioner must demonstrate that the evidence in question was material to an issue at trial. *See Minnick*, 698 N.E.2d at 755. Evidence is only material if there is a reasonable probability that the outcome of the trial would have been different if the evidence had been disclosed to the defense. *See Bagley*, 473 U.S. at 682. As we discussed above, the State provided overwhelming evidence of Dickens's guilt that was not related to or affected by the CBLA evidence. This overwhelming evidence included eyewitness testimony placing only Dickens on the porch with Corporal Deguch at the time of the shooting, testimony regarding Dickens's actions immediately following the shooting, evidence contradicting Dickens's account of who shot Corporal Deguch, and other unchallenged forensic evidence. In light of this overwhelming evidence of Dickens's guilt, we conclude that Dickens cannot establish that there is a reasonable probability that the outcome of his trial would have been different if the State had notified Dickens's counsel of

11

the questionable nature of the reliability of the CBLA evidence prior to trial. Accordingly, the post-conviction court did not err in determining that Dickens did not suffer a *Brady* violation which would necessitate a new trial.

### III.  Ineffective Assistance of Counsel

"The right to effective counsel is rooted in the Sixth Amendment to the United States Constitution." *Taylor*, 840 N.E.2d at 331. "'The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 685 (1984)). "'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Id.* (quoting *Strickland*, 466 U.S. at 686).

A successful claim for ineffective assistance of counsel must satisfy two components. *Reed v. State*, 866 N.E.2d 767, 769 (Ind. 2007). Under the first prong, the petitioner must establish that counsel's performance was deficient by demonstrating that counsel's representation "fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *Id.* We recognize that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or most effective way to represent a client and therefore under this prong, we will assume that counsel performed adequately, and will defer to counsel's strategic and tactical decisions. *Smith v. State*, 765 N.E.2d 578, 585 (Ind. 2002). Isolated

12

mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Id.*

Under the second prong, the petitioner must show that the deficient performance resulted in prejudice. *Reed*, 866 N.E.2d at 769. A petitioner may show prejudice by demonstrating that there is "a reasonable probability (*i.e.*, a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different." *Id.* A petitioner's failure to satisfy either prong will cause the ineffective assistance of counsel claim to fail. *See Williams*, 706 N.E.2d at 154. Stated differently, "[a]lthough the two parts of the *Strickland* test are separate inquires, a claim may be disposed of on either prong." *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (citing *Williams*, 706 N.E.2d at 154).

Dickens challenges the post-conviction court's determination that his trial counsel were not ineffective. Dickens claims that his trial counsel were ineffective for failing to protect his right to be tried free of restraints. Specifically, Dickens argues that his counsel were ineffective for failing to object to the use of a stun belt,[4] worn under his clothes, as a restraint at trial.

> A defendant has the right to appear in front of a jury without physical restraints, unless such restraints are necessary to prevent the defendant's escape, to protect those present in the courtroom, or to maintain order during trial. *Bivins v. State*, 642 N.E.2d 928, 936 (Ind. 1994). This right springs from the basic principle of American jurisprudence that a person accused of a crime is presumed innocent until proven guilty beyond a reasonable doubt. *Sweet v. State*, 498 N.E.2d 924, 929 (Ind. 1986), *superceded on other grounds by* Ind.

---

[4] A stun belt is an electronic shocking device that is secured around the wearer's waist. *Wrinkles v. State*, 749 N.E.2d 1179, 1193 (Ind. 2001).

13

> Evidence Rule 404; *see also Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S.Ct.
> 1340, 89 L.Ed.2d 525 (1986); *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct.
> 1691, 48 L.Ed.2d 126 (1976). For this presumption to be effective, courts
> must guard against practices that unnecessarily mark the defendant as a
> dangerous character or suggest that his guilt is a foregone conclusion. *Sweet*,
> 498 N.E.2d at 929; *see also Holbrook*, 475 U.S. at 567-68, 106 S.Ct. 1340;
> *Estelle*, 425 U.S. at 503, 96 S.Ct. 1691.

*Wrinkles*, 749 N.E.2d at 1193 (Ind. 2001).

In arguing that his trial counsel were ineffective for failing to object to the use of the stun belt at trial, Dickens points to *Deck v. Missouri*, in which the United States Supreme Court held that due process does not permit the use of *visible* restraints if the trial court has not taken into account the circumstances of the particular case. 544 U.S. 622, 632 (2005). In reaching this holding, the Court noted that the "law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." *Id*. at 626. The Court determined that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id*. at 629. "Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." *Id*.

Upon review, we conclude that Dickens has failed to prove that he was prejudiced by trial counsel's failure to object to his wearing a stun belt during trial. The United States Court of Appeals for the Seventh Circuit has described the use of a stun belt as a "'method[] of restraint that minimize[s] the risk of prejudice' because it is hidden beneath a defendant's

14

clothing."[5] *Stevens v. McBride*, 489 F.3d 883, 899 (7th Cir. 2007) (quoting *United States v. Brooks*, 125 F.3d 484, 502 (7th Cir. 1997)) (brackets in original). Unlike shackles, which when worn are readily visible, a stun belt is worn under clothing and is, in most cases, unlikely to be visible to the members of the jury. Here, nothing in the record suggests that any member of the jury actually saw the stun belt.

In *Wrinkles*, counsel indicated that it did not object to the use of a stun belt because counsel did not believe the belt would be visible to members of the jury. 749 N.E.2d 1195. The Indiana Supreme Court concluded that the petitioner failed to sustain his burden of demonstrating that counsels' performance fell below an objective standard of reasonableness because counsel did not believe an objection to the use of restraints would be sustained and also because counsel believed the use of the stun belt would be less prejudicial than the use of shackles. *Id*. In *Brooks*, the United States Court of Appeals found that the trial court was justified in putting stun belts on the defendants to cover potential security risks where the defendants had a history of violence and had previously attempted to escape from custody. 125 F.3d at 502.

During the PCR hearing, one member of Dickens's trial counsel team stated that he did not object to the use of the stun belt because he did not consider it to be a restraint since it was not visible. This counsel also indicated that because of the nature of the charges levied

---

[5] We note that the Indiana Supreme Court held in 2001 that stun belts could no longer be used on defendants in Indiana courtrooms due to the mental anguish that results from simply wearing the stun belt and the physical pain that results if the belt is activated. *Wrinkles*, 749 N.E.2d at 1194-95. This holding, however, was handed down well after Dickens's trial and, accordingly, does not impact Dickens's claim on appeal. *See generally id.* at 1195 (providing that petitioner is not entitled to relief merely because the Indiana Supreme Court prohibits future use of stun belts in Indiana courtrooms).

against Dickens, he did not believe that any objection to the use of restraints would have been sustained. This counsel indicated that he subsequently questioned Dickens about the stun belt because he thought the belt might have been visible when Dickens moved around the court room. This conversation included a vague reference to an electronic restraint that was being worn for security purposes. This counsel chose not to expand upon this line of questioning and did not mention the restraint at any other time during trial.

The post-conviction court noted that Dickens had a history of attempted flight from police and a history of violence, both in and out of custody. Dickens had fled from police both in a vehicle and on foot on two prior occasions. Dickens had previously "pistol whipped" someone, pointed a gun at another person's face, and engaged in fights while in custody. Appellant's App. p. 313. The post-conviction court also noted that Dickens's trial occurred in a tense and emotional atmosphere in which a teenager was facing the death penalty for killing a police officer while the officer was engaged in his official police duties. The post-conviction court found that in light of these facts, it was unlikely that any objection to the use of restraints would have been sustained.

On appeal, Dickens failed to demonstrate that he was prejudiced by counsels' failure to object to the use of the stun belt. Again, a petitioner shows prejudice by demonstrating that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. As we have discussed above, the State provided overwhelming evidence of Dickens's guilt, including eyewitness testimony placing only Dickens on the porch with Corporal Deguch at the time of the shooting, testimony regarding Dickens's

16

actions immediately following the shooting, evidence contradicting Dickens's account of who shot Corporal Deguch, and other unchallenged forensic evidence. Upon finding Dickens guilty of Corporal Deguch's murder, the jury considered the facts and circumstances argued by the parties and recommended life imprisonment without parole rather than the death penalty. The trial court accepted this recommendation.

Again, the stun belt was not visible to the jury, the record contained one passing reference to the use of restraints, and the post-conviction court found that an objection to the use of the restraints would likely have been denied. In light of these facts coupled with the overwhelming evidence of Dickens's guilt, we conclude that Dickens has failed to show that the outcome of the proceeding would have been different had Dickens's trial counsel objected to the use of a stun belt during trial. Further, to the extent raised by Dickens on appeal, Dickens has also failed to show that the jury's recommendation with regard to sentencing would have been different but for counsel's alleged error. As such, we conclude that Dickens cannot establish that he suffered ineffective assistance of trial counsel because he has failed to demonstrate that he was prejudiced by counsel's allegedly ineffective performance. *See Reed*, 866 N.E.2d at 769 (providing that in order to prove a claim of ineffective assistance of counsel, petitioner must prove both prongs set forth in *Strickland*, *i.e.*, defective performance and prejudice); *see Grinstead*, 845 N.E.2d at 1031 (providing that a claim of ineffective assistance of counsel can be disposed of on either prong).

## CONCLUSION

In sum, because we conclude that the newly discovered evidence did not necessitate a

new trial, Dickens did not suffer a *Brady* violation that would necessitate a new trial, and Dickens did not receive ineffective assistance of trial counsel, we affirm the judgment of the post-conviction court.

The judgment of the post-conviction court is affirmed.

BAILEY, J., and MAY, J., concur.