**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 24 2014, 9:51 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**F. THOMAS SCHORNHORST**
Oxford, Mississippi

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**HENRY A. FLORES**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL C. WILSON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1401-PC-49 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Lisa F. Borges, Judge
Cause No. 49G04-0704-PC-57737

**October 24, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Judge**

## Case Summary and Issue

A jury found Michael Wilson guilty of murder in 2008. He was ordered to serve a sixty-year sentence, with fifteen years suspended subject to five years of probation. Wilson sought post-conviction relief, alleging ineffective assistance of his trial counsel. Following a hearing, the post-conviction court denied Wilson's petition for relief. Wilson now appeals, raising the sole issue of whether the post-conviction court erred in finding Wilson was not deprived of the effective assistance of counsel at his trial. Concluding none of the errors alleged by Wilson amount to ineffective assistance of counsel, alone or cumulatively, we affirm.

## Facts and Procedural History[1]

The relevant facts were set forth by this court in a memorandum decision on direct appeal:

> The facts most favorable to the verdict reveal that thirty-two-year-old Wilson and thirty-three-year-old Nupur Srivastava met at a drug and alcohol rehabilitation center in New York in November 2006. After Nupur was discharged from the center, she joined Wilson at his father's home in Indianapolis in January 2007, and later rented an apartment on the north side of town. In early April 2007, while Nupur was visiting her family in Maryland, her parents convinced her she needed to return to the rehabilitation center. Nupur briefly returned to Indianapolis to retrieve her belongings. The day before she was scheduled to leave Indianapolis, Nupur and Wilson were drinking whiskey and arguing on Wilson's father's patio when Wilson splashed Nupur with gasoline and set her on fire.
>
> Nupur ran through Wilson's father's house to the bathroom where she filled up the bathtub and jumped into it to put out the flames. While she was in the bathtub, Wilson called 911 to report a fire. During the phone call, Nupur asked Wilson why he had done that. Wilson responded, "I didn't think it was going to be like that, I swear."

---

[1] We heard oral argument at Frankfort High School in Frankfort, Indiana, on October 7, 2014. We extend our appreciation to the Clinton County bench and bar, Frankfort High School faculty and staff, and students from area schools who collectively made the argument a success. We also commend counsel for their presentations.

When paramedics arrived at the scene, Nupur walked unassisted out of the garage. Paramedic Jeff Brown ran to Nupur and escorted her to an ambulance. When Brown asked Nupur what had happened, she told the paramedic that Wilson had poured gas on her and set her on fire. Brown placed Nupur in the ambulance and turned to see a naked Wilson standing in the yard. Wilson had burns on his hands and portions of his forearms. Wilson told the paramedic that there had been an accident with the gas grill. On the way to the hospital, Nupur again told Brown as well as paramedic Shawn Grindstaff that she and Wilson were arguing when Wilson threw gasoline on her and lit her on fire. Wilson told another paramedic and a hospital nurse that the fire started when he and Nupur tried to light a grill using gasoline.

The following day, Indianapolis Police Department Sergeant John Breedlove went to the hospital to interview Wilson. Before the interview, Breedlove consulted with hospital staff who advised him that Wilson was taking Percocet for pain. Before questioning Wilson, Sergeant Breedlove read him his Miranda rights and had him sign a waiver of rights form.[2] Wilson told the sergeant that he understood his rights, and the sergeant began to question him.

During the interview, Wilson asked to make a telephone phone call so that he could talk to someone because of the seriousness of the events. The sergeant told Wilson that he could stop answering questions at any time and allowed Wilson to make a telephone call. Wilson attempted to call his father, who he was unable to reach. After making the phone call, Wilson told the sergeant that the person he wanted to speak to was his father but that he was unable to reach him.

Sergeant Breedlove readvised Wilson of his rights, and Wilson told the sergeant that he understood those rights and was willing to continue answering questions. During the interview, Wilson appeared coherent, understood the questions the sergeant asked him, never became confused, and thought about and provided answers to the questions. Although Wilson delayed answering some of the questions about how Nupur became doused with gasoline and set on fire, Sergeant Breedlove interpreted Wilson's responses to be deceitful rather than confused.

During the interview, Wilson admitted that his previous story about the grill accident was not true. Wilson explained that he told that story because he panicked. According to Wilson, he was holding a gas can while he and Nupur were arguing. Nupur pulled on the can and gas apparently

---

[2] On rehearing, this statement was corrected to note that because of injuries to Wilson's hands, he was unable to sign the form for himself. Instead, after he was advised of his rights and verified that he understood them, Sergeant Breedlove wrote on the waiver of rights form that Wilson was unable to sign because he was injured. This correction did not alter our original disposition regarding the admissibility of his statement. Wilson v. State, No. 49A05-0806-CR-329, 904 N.E.2d 392 at *1 (Ind. Ct. App., Mar. 25, 2009).

3

splashed on her and ignited when one of them lit a cigarette. Wilson explained that when Nupur drank alcohol, "she always [got] very, very argumentative and want[ed] to put [Wilson] down and want[ed] to say things to push buttons." The State subsequently charged Wilson with attempted murder and aggravated battery. Nupur, who had third degree burns on 80% of her body, was placed in a drug-induced coma to allow for treatment and pain management. After she died from multi-organ failure resulting from her burns five weeks later, Wilson was charged with murder.

At trial, additional evidence revealed that in March 2007, while Nupur was staying at a hotel in Indianapolis, she and Wilson got into a physical altercation. Jimmy Barona, the hotel's owner, testified that Nupur's hair was messed up, and she had a black eye and scratches on her face. When Nupur and Barona told Wilson to leave Nupur's hotel room, Wilson pushed Nupur and appeared ready to fight Barona. Barona and a hotel maintenance worker had to physically remove Wilson from the room.

In addition, a former neighbor testified that Wilson and Nupur argued every day. According to the neighbor, one night Wilson banged on Nupur's apartment door for hours demanding to be let into the apartment. The following morning, the neighbor noticed plaster from the ceiling and the walls had been knocked to the floor by Wilson's banging.

Also at trial, ATF Fire Research Engineer Brian Grove testified that he conducted nine tests where gas was splashed on a manikin [sic] wearing jeans and a sweater similar to those that Nupur was wearing. The tests revealed that Nupur was seated when she was doused with approximately one-half cup of gasoline below her waistband and above her knees. The gasoline was then ignited with a flame, not a cigarette, which had to have been placed one to two inches from the gasoline. Two lighters were found on the patio where Nupur was sitting. One of the lighters was found on a table, and the other was found on the ground.

Wilson testified that at the time he gave his statement to Sergeant Breedlove, Wilson was "pretty doped up," and easily confused. He also testified that Nupur set herself on fire and asked him not to tell anyone what she had done. . . .

Wilson v. State, No. 49A05-0806-CR-329, 900 N.E.2d 828 at *1-2 (Ind. Ct. App., Jan. 16, 2009) (record citations omitted), corrected on reh'g, trans. denied. Wilson's family retained attorney Marvin Coffey shortly after the charges were filed, and Coffey represented Wilson through trial and sentencing. A jury found Wilson guilty after a

4

three-day trial, and the trial court sentenced him to sixty years, with fifteen years suspended, five of which were to be served on probation.

On direct appeal, Wilson argued the trial court erred in admitting into evidence his statement to police because it was not voluntary and was admitted in violation of his right to counsel. He also argued the evidence was insufficient to support his conviction. This court affirmed Wilson's conviction, holding the trial court did not err in admitting his statements, id. at *3-4, and there was sufficient evidence to support the jury's verdict, id. at *5.

In 2009, Wilson filed a petition for post-conviction relief that was later amended by counsel. He alleged he was entitled to relief because his trial counsel had been ineffective in numerous respects. Following a hearing, the post-conviction court entered findings of fact and conclusions thereon, denying Wilson's petition for post-conviction relief upon finding his trial counsel was not ineffective. Wilson now appeals the denial of relief.

Discussion and Decision

I. Standard of Review

A. Post-Conviction Relief

The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); Garrett v. State, 992 N.E.2d 710, 718 (Ind. 2013). When appealing from the denial of post-conviction relief, the petitioner is appealing from a negative judgment and bears the burden of showing that the evidence as a whole unerringly and unmistakably leads to a

5

conclusion opposite that reached by the post-conviction court. Wilkes v. State, 984 N.E.2d 1236, 1240 (Ind. 2013). "In other words, the [petitioner] must convince this Court that there is no way within the law that the court below could have reached the decision it did." Id. (emphasis in original) (citation omitted). In reviewing the judgment of the post-conviction court, we consider only the evidence and reasonable inferences supporting the judgment. Walker v. State, 988 N.E.2d 1181, 1185 (Ind. Ct. App. 2013), trans. denied. The post-conviction court is the sole judge of the evidence and the credibility of the witnesses, and we accept the court's findings of fact unless they are clearly erroneous.[3] Dickens v. State, 997 N.E.2d 56, 60 (Ind. Ct. App. 2013), trans. denied. We accord no deference to the court's conclusions of law, however. Id.

### B. Ineffective Assistance of Counsel

In his petition for post-conviction relief, Wilson alleged that he received ineffective assistance from his trial counsel. To prevail on an ineffective assistance claim, Wilson must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984). First, he must demonstrate that his counsel's performance was deficient; that is, that counsel's performance "fell below an objective standard of reasonableness." Id. at 687-88. Our scrutiny of counsel's performance is "highly

---

[3] As part of his Statement of the Case, Wilson alleges the post-conviction court's "findings are not the product of independent and objective decision-making" and should not be accorded deference because they are the State's proposed findings verbatim. Brief of Appellant at 2-3. Although the wholesale adoption of the prevailing party's findings and conclusions is not encouraged, neither is it prohibited. Prowell v. State, 741 N.E.2d 704, 708-09 (Ind. 2001). The critical inquiry is whether the findings made or adopted by the court are clearly erroneous. Saylor v. State, 765 N.E.2d 535, 565 (Ind. 2002), rev'd on reh'g on other grounds, 808 N.E.2d 646 (Ind. 2004).

Wilson also mentions that the post-conviction court's order does not include citations to the record, "depriving this Court of means by which to gauge the accuracy of the hearing court's findings[,]" citing Appellate Rule 22(C). Appellant's Brief at 3. While citations to the record by the post-conviction court would certainly be welcome, Rule 22 (C) applies to the parties' briefing of a case on appeal and does not impose any requirements on the lower court.

deferential[,]" and we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "[A] defendant must offer strong and convincing evidence to overcome this presumption." Ritchie v. State, 875 N.E.2d 706, 714 (Ind. 2007). Second, he must show that the deficient performance caused prejudice to him by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. A defendant claiming ineffective assistance must make both showings, and therefore, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant" if addressing prejudice first is the easier course. Id. at 697. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that it deprived the defendant of a fair trial." Ritchie, 875 N.E.2d at 719.

## II. Assertions of Ineffective Assistance by Trial Counsel

Wilson cites several instances in which his trial counsel allegedly performed deficiently and caused him prejudice. We address each in turn.

## A. Lesser-Included Offenses

Wilson alleges his trial counsel was ineffective for failing to adequately counsel him about the possibility of tendering lesser-included offense instructions to the jury, prejudicing him because he might not have been convicted of murder if the instructions had been given. As to this allegation of error, the post-conviction court concluded that

7

the decision was a reasonable tactical decision made with input from Wilson and that there was no prejudice because the record supports the jury's finding.

Coffey testified at the post-conviction hearing that he had consulted with Wilson prior to trial about the possibility of offering instructions on lesser-included offenses:

> Well, I just explained to him that those charges carry lesser penalties. I also explained to him that if they – if the State did not make all the elements of a murder case that they might just have him walk or might find him not guilty. Then there's a decision you have to make as to whether you want to risk all or nothing. Whether there's an opportunity for the State not to convince the jury that he was guilty of an intentional act, okay, that is laid out in the law. On the other hand, when you put in lesser included offenses, sometimes the jury will come back and they'll compromise . . . . I explained all of that to him and I told him the decision was his to make whether he wanted me to put those in or not.

PCR Transcript at 47-48. He further testified that Wilson was the one who ultimately decided to put the State to its proof on murder alone, though he admitted he did not think either of them was sure that was the correct course. Id. at 112-13.[4]

Assuming without deciding that Wilson would have been entitled to lesser-included offense instructions, it is well established that counsel may pursue an "all or nothing" strategy. Hogan v. State, 966 N.E.2d 738, 749 (Ind. Ct. App. 2012), trans. denied. Our supreme court has previously held that "a tactical decision not to tender a lesser included offense does not constitute ineffective assistance of counsel, even where the lesser included offense is inherently included in the greater offense." Autrey v. State, 700 N.E.2d 1140, 1141 (Ind. 1998) (citation omitted). Such a strategy does not constitute ineffective assistance of counsel unless it is "so deficient or unreasonable as to fall

---

[4] Wilson also testified at the post-conviction hearing and disagreed with Coffey's characterization of their discussion and the decision regarding lesser-included offenses. The post-conviction court specifically stated that it found Coffey's testimony on this issue credible and Wilson's not credible. See PCR Appendix at 76.

outside of the objective standard of reasonableness." Id. "This is so even when such choices may be subject to criticism or the choice ultimately prove detrimental to the defendant." Id. (internal quotation and citation omitted). "It is not proper for [appellate courts] to second-guess an attorney through the distortions of hindsight." Page v. State, 615 N.E.2d 894, 896 (Ind. 1993).

Here, Coffey testified that his primary strategy was to stick to Wilson's version of events and show that the fire was the result of an accident or was Nupur's own doing. Cf. Smith v. State, 792 N.E.2d 940, 945-46 (Ind. Ct. App. 2003) (holding trial counsel was not ineffective for failing to tender lesser-included offense instructions even when trial strategy was to argue that the defendant was guilty of a lesser offense but not guilty of the charged offense), trans. denied. He testified regarding the concern over a compromise verdict if lesser-included offense instructions were given. And he testified that he ultimately left the decision to Wilson. Though the all or nothing strategy can be risky, it is a viable and reasonable strategy in the proper circumstances. See Lane v. State, 953 N.E.2d 625, 630 (Ind. Ct. App. 2011).

Wilson argues the strategy was not reasonable in this case because it became untenable when the trial court made evidentiary rulings against the defense. Coffey had wanted to introduce evidence that Nupur had made a prior false allegation of abuse by a boyfriend in order to cast doubt on her statements implicating Wilson. This avenue of inquiry, among others addressing Nupur's credibility, was denied by a pre-trial ruling. At Coffey's request, the trial court certified its order for interlocutory appeal, but this court denied the motion to accept the appeal. He had also wanted to introduce evidence

9

regarding the fact that Nupur was Hindu and that fire and reincarnation were important elements of the Hindu religion to support the idea that she might have intentionally set the fire herself.[5] This, too, was denied by a pre-trial ruling. Coffey made an offer of proof at trial regarding both issues in order to preserve the evidentiary issues for appeal. Coffey believed that the evidence should have been admitted and that if Wilson was found guilty, his conviction would be reversed on appeal due to errors in the trial court's evidentiary rulings. See PCR Tr. at 43 (Coffey testifying that he told Wilson "if we can't get it in now after an appeal, we we're [sic] gonna get a new trial."). He therefore took steps to preserve the alleged error and continued to pursue the accident/self-inflicted injury theory through the available evidence.

Although Wilson contends pursuing this theory even after the evidence was excluded was a fundamentally flawed strategy, he does not suggest an alternative theory that would have fared better.[6] Wilson was charged with "knowingly kill[ing] another human being, namely: Nupur Srivastava, by pouring or placing gasoline on [her] person and/or clothing . . . and lighting her on fire with a flame source . . . ." Trial App. at 74. Wilson's statements, though inconsistent in the details, were consistent in asserting that he did not know how the gas was spilled on Nupur or how the fire was ignited. Based on those statements, a defense theory that he did not have the requisite mens rea to support a murder conviction as charged was reasonable, whether or not the proffered evidence was

---

[5] According to the State's Motion in Limine, "it appears that [the testimony of a proposed defense witness] would concern an old Hindu practice of sati which is to burn oneself to death." Tr. App. at 209.

[6] If the ultimate goal was to procure an outright acquittal, the all or nothing approach Coffey pursued was the only reasonable strategy, as even Wilson's post-conviction counsel conceded at oral argument that if the lesser-included offense instructions had been given, Wilson would at least have been found guilty of reckless homicide.

10

in fact admissible. "Counsel is afforded considerable discretion in choosing strategy and tactics, and these decisions are entitled to deferential review." Stevens v. State, 770 N.E.2d 739, 746-47 (Ind. 2002), cert. denied, 540 U.S. 830 (2003).

Moreover, our supreme court held in a similar case that not only was trial counsel's all or nothing strategy a reasonable tactical decision, but also that the defendant did not demonstrate prejudice because his conviction was not "fundamentally unfair or unreliable." Autrey, 700 N.E.2d at 1142 (quotation omitted). This court has already held on direct appeal that there was sufficient evidence supporting Wilson's murder conviction. The failure to request lesser-included offense instructions does not warrant reversal when the facts support a conviction of the greater offense. Warner v. State, 577 N.E.2d 267, 271-72 (Ind. Ct. App. 1991) (holding that defendant was not prejudiced by counsel's failure to tender lesser-included offense instructions where court had already determined the evidence was sufficient to support conviction of the greater offense). If the jury had been instructed on lesser-included offenses, it still would have considered the same evidence. Based upon that evidence, the jury found the State had proved beyond a reasonable doubt the elements of knowing murder. We cannot say the result was fundamentally unfair or unreliable.

Finally, Wilson argues that his discussions with Coffey regarding lesser-included offenses occurred before trial and were not ongoing as the proceedings developed and circumstances changed. Coffey did testify that the discussions took place prior to trial. However, the discussions took place after they knew the trial court was not going to

allow some of the evidence he had intended to present.[7] This was not a situation where the decision was made in advance of trial with the expectation that certain evidence would be admitted and then when that evidence was excluded at trial, the decision should have been reconsidered in light of the new circumstances. Rather, the decision was made with full knowledge of that evidence being unavailable to the defense. See PCR Tr. at 46-47 (Coffey testifying that he last spoke with Wilson about lesser-included instructions one to three weeks prior to trial and that "when I explained that to him, I knew that they weren't gonna let [that evidence] in . . . ."), and at 221 (Wilson testifying that he "was made aware that several key pieces of evidence were not gonna be allowed in the trial."). Wilson does not point to any other development during trial that substantially changed the understanding with which he made his decision or that should have changed the strategic decision to seek an all or nothing verdict on the murder charge.

## B. Failure to Present Evidence

Wilson next alleges his trial counsel was ineffective for failing to present evidence regarding both his and Nupur's levels of intoxication at the time of the incident, prejudicing him because the reliability of statements made in the immediate aftermath would have been suspect with this evidence. With respect to this allegation of ineffective assistance, the post-conviction court concluded that Wilson had shown neither deficient performance nor prejudice.

---

[7] Coffey made an offer to prove at trial and the trial court made a final ruling affirming its earlier orders on the motions in limine. This ruling confirmed but did not change the circumstances under which Wilson made the decision to proceed without lesser-included instructions.

Coffey testified at the post-conviction hearing that he considered Nupur's state of sobriety at the time of the incident to be important. Contained within Nupur's medical records, which Coffey subpoenaed as part of his trial preparation, was evidence of her blood alcohol concentration shortly after she arrived at the hospital (.266) and four hours later (.177). However, Coffey testified that when he reviewed the records pre-trial, he did not recognize the significance of anything therein in relation to her level of intoxication "because I didn't understand it at the time." PCR Tr. at 61; see also id. at 66 ("I have not had that much experience with blood alcohol levels in alcohol records, so I didn't understand what that meant."). Coffey did, however, have a doctor review the records, so he did not rely solely on his own understanding (or lack thereof) of the records. Further, he elicited testimony at trial that Nupur had a drinking problem, that she and Wilson met at a rehabilitation facility, that she was on the verge of returning to rehab when this incident occurred, and that on the way to the hospital, she told the paramedic that she had "a lot" to drink before the incident. Trial Tr. at 151-52.

At the post-conviction hearing, Wilson presented the testimony of Dr. Daniel McCoy, a toxicology consultant, who explained the significance of the blood alcohol numbers in Nupur's hospital records and used them to back extrapolate her blood alcohol level at the time of the incident. He further explained how intoxication impacts perception, memory, and ability to communicate. Wilson argues Coffey should have presented similar evidence during his trial because, as his post-conviction legal expert testified, a toxicological expert in essence could have said to the jury, Nupur's statements immediately following the incident were unreliable for scientific reasons. "While

13

defense counsel is not ineffective when he fails to present <u>all</u> evidence in support of the defense position, counsel's representation cannot be deemed adequate or effective when he fails to produce <u>any</u> evidence at all from available sources in support of a defense." <u>Williams v. State</u>, 508 N.E.2d 1264, 1268 (Ind. 1987) (emphasis added). Given Coffey's admission that he did not understand the blood alcohol results in the medical records, we cannot categorically say that his omission of them as evidence was a strategic decision,[8] but we can say that the essence of the information was communicated to the jury. Although he may not have presented all available evidence, Coffey did present evidence of Nupur's intoxication at the time of the incident as well as her history with alcohol. And the members of the jury likely brought with them into the courtroom their own experiences or observations regarding the effects of intoxication. "Strickland does not guarantee perfect representation, only a reasonably competent attorney." <u>Woodson v. State</u>, 961 N.E.2d 1035, 1041-42 (Ind. Ct. App. 2012) (citation and quotation marks omitted), <u>trans. denied</u>.

With regard to Wilson, his hospital records also contained evidence of his blood alcohol content, and again, Coffey did not present this evidence to the jury. During the post-conviction hearing, Dr. McCoy explained the significance of Wilson's records, conducted the calculation to determine his blood alcohol content at the time of the incident, and again described the cognitive effects of intoxication. Wilson argues Coffey should have presented this evidence at trial because the State relied in part on his

---

[8] Counsel did also testify that he did not want Nupur's entire medical record being admitted and the State had indicated to him that if he tried to introduce part of the record, the State would request that the remainder be admitted. PCR Tr. at 74-75.

inconsistent statements and a high level of intoxication could explain those inconsistencies. However, the defense theory relied on the jury believing Wilson's recollections from the day of the incident—that the fire started accidentally or was started by Nupur herself, that he tried to put the fire out, and that he carried her into the house and put her in the bathtub. Although there was testimony that Wilson, too, had been drinking prior to the incident, focusing on the unreliability of intoxicated persons in remembering and relating events by calling an expert to testify at length would have undermined that theory. "There is no constitutional requirement that a defense attorney be a flawless strategist or tactician." Woodson, 961 N.E.2d at 1042. "Reasonable strategy is not subject to judicial second guesses." Pryor v. State, 973 N.E.2d 629, 632 (Ind. Ct. App. 2012) (citation omitted). We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." Whitener v. State, 696 N.E.2d 40, 42 (Ind. 1998).

Even if counsel should have introduced the blood alcohol evidence and provided a thorough explanation of the cognitive effects of intoxication and how that related to the evidence at trial, we cannot say Wilson has shown a reasonable probability that the result would have been different. Intoxication was an element of the case even without the specific numbers. Wilson has not convinced us there is no way the post-conviction court could have concluded counsel was not ineffective in this regard.

15

## C. Failure to Object

Wilson next contends his trial counsel was ineffective for failing to object to Nupur's statements to the paramedics and to evidence of uncharged misconduct on Wilson's part. In order to prove ineffective assistance premised on counsel's failure to object, the petitioner must show that an objection would have been sustained if it had been made, that the failure to object was unreasonable, and that he was prejudiced. Potter v. State, 684 N.E.2d 1127, 1134 (Ind. 1997). The post-conviction court concluded Wilson had neither proven an objection would have been sustained nor that he was prejudiced by the failure to object.

### 1. Nupur's Statements

Wilson contends that Coffey should have objected to statements Nupur made to paramedics implicating Wilson and that had he objected, the objection would have been sustained because whether or not Nupur's statements were admissible under our hearsay rules as Coffey believed, they were testimonial statements precluded by the Confrontation Clause as explained beginning with Crawford v. Washington, 541 U.S. 36 (2004).

The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, provides in relevant part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." A witness's testimony against a defendant is inadmissible under the Confrontation Clause unless the witness appears at trial or, if the witness is unavailable, the defendant had an opportunity to cross-examine him prior to

16

trial. Crawford, 541 U.S. at 53-54. Accordingly, the United States Supreme Court has determined that a statement violates the Confrontation Clause if it is testimonial in nature. Id. at 59. Testimonial statements by a person who is absent from trial are prohibited even if they qualify for a state hearsay exception. Fowler v. State, 829 N.E.2d 459, 464 (Ind. 2005), cert. denied, 547 U.S. 1193 (2006). To determine whether a statement is testimonial, we must decide whether it has "a primary purpose of creating an out-of-court substitute for trial testimony." Michigan v. Bryant, 131 S.Ct. 1143, 1155 (2011).

> Although the U.S. Supreme Court did not comprehensively define the breadth of testimonial statements in Crawford, it did describe a core class of testimonial statements that included (1) ex parte in-court testimony such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; (2) extrajudicial statements contained in formalized testimonial materials, affidavits, depositions, prior testimony, or confessions; and (3) statements made under circumstances that would lead an objective witness to reasonably believe that the statement would be available for later use at a trial.

Baer v. State, 942 N.E.2d 80, 106 (Ind. 2011) (citing Crawford, 541 U.S. at 51-52). The primary purpose inquiry is an objective one. Bryant, 131 S.Ct. at 1156. Important considerations are whether an ongoing emergency exists, the formality or informality of the encounter, the victim's medical condition, and the statements and actions of all participants. Id. at 1156-62. This court has applied the primary purpose inquiry to statements made in circumstances outside the realm of police questioning. Perry v. State, 956 N.E.2d 41, 53 (Ind. Ct. App. 2011) (applying the inquiry to statements made to medical personnel).

17

Jeffrey Brown, one of the firefighters/paramedics who responded to the 911 call about a residence fire and a possible injured person testified that when he saw Nupur walking out of the garage, "the front of her clothes were burned off from her jeans at her knee level all the way up to her shirt and her bra and there was some skin hanging off the front and her bra was hanging down and her jeans were basically burned off in the front . . . ." Trial Tr. at 132. He did not want her to sit down or to stop so he escorted her to the waiting ambulance and observed "burns [that] looked like third degree full – what we call full thickness burns and the most severe area was from the middle of her thighs to her belly button." Id. at 133. She asked him a couple of times to help her. In order to be able to tell emergency room staff what they were dealing with, he asked her what had happened, at which time she "looked back towards the house [and] said, he poured gas on me and burned—" Id. at 134. Only then did Brown realize "that there was a scene here that we weren't prepared for," and indicated to his colleagues police should be called. Id.

After Brown escorted Nupur to the ambulance, he stepped away to allow the EMTs room to work and then he saw Wilson for the first time. During a brief encounter, Wilson told Brown that they had an accident with the grill. Because there were other paramedics and EMTs on site who could help Wilson, Brown got back in the ambulance to assist with Nupur and "[j]ust to verify the situation again [because w]e don't know how long our patients are gonna stay conscious especially if it's a severe injury[,]" he asked Nupur to confirm what had happened and she again stated that "he poured gas on me. He burnt me." Id. at 138. All of this occurred in "just maybe a minute or so initial treatment on the patient . . . and yes, we – at that point in time we don't waste any time

18

on the scene." Id. Brown considered Nupur's injuries potentially fatal because of the severity of the burns.

The circumstances of the encounter were informal and brief. The encounter occurred at the scene while there was urgency to assess and begin to treat Nupur's burns. Brown, seeing only Nupur at first, had no reason to believe that anyone else was involved when he first asked her what had happened. Nupur was obviously seriously injured and her first statements were to ask Brown to help her. Although Brown did repeat his initial question to Nupur, he did not ask for any further details or continue questioning her about the incident. Though Brown's thoughts may have turned toward investigation after Nupur indicated another person had caused her harm, and especially after he heard a different explanation from Wilson, there is no indication that his initial question to Nupur was for the primary purpose of creating an out-of-court substitute for testimony. Objectively evaluating the statements and actions of the parties to the encounter and in light of the circumstances in which the "interrogation" occurred, at the very least, Nupur's initial statement that Wilson had poured gas on her and burned her was not testimonial in nature and her subsequent statements were cumulative of evidence properly admitted. Therefore, an objection based on Crawford would not have been sustained if made and as the post-conviction court found, Wilson did not prove that Coffey was ineffective for failing to make the objection.[9]

---

[9] Because such an objection would not have been sustained even if made, there is no need to address Wilson's allegations that Coffey was ineffective because he was not aware of Crawford and its progeny at the time of trial.

19

As to the hearsay rules, Coffey testified (albeit somewhat vaguely) that he thought the statements were admissible and the post-conviction court found that Nupur's statements would have been admitted under the excited utterance or medical diagnosis exceptions. See Ind. Evidence Rule 803(2), (4). For a statement to be admitted under Indiana Rule of Evidence 803(2), the exception for an excited utterance, three elements must be shown: (1) a startling event, (2) a statement made by a declarant while under the stress of excitement caused by the event, and (3) that the statement relates to the event. Fowler v. State, 829 N.E.2d 459, 463 (Ind. 2005). "The ultimate issue is whether the statement is deemed reliable because of its spontaneity and lack of thoughtful reflection and deliberation." Id. A declaration does not lack spontaneity just because it was in answer to a question. Yamobi v. State, 672 N.E.2d 1344, 1346 (Ind. 1996). In addition, the time between the startling event and the hearsay statement is one factor to be considered, but the amount of time that has passed is not dispositive. Id.

Here, catching on fire is unquestionably a startling event. Brown testified that they arrived "very quickly" after getting the 911 call, trial tr. at 134, and he was on the scene for only a few minutes before Nupur was transported to the hospital. Nupur's statements to him were therefore made shortly after the event, and given that she initially and repeatedly expressed a desire for help, it is clear that she was under the stress of the event. Finally, her statement related to the event. The post-conviction court did not

20

clearly err in finding that the statements would have been admitted under an exception to the hearsay rule and that Coffey was not ineffective for failing to object on this basis.[10]

## 2. Uncharged Misconduct

Wilson also contends that Coffey should have objected to evidence of Wilson's uncharged misconduct against Nupur on two prior occasions: 1) testimony that a neighbor heard frequent arguing between Wilson and Nupur in early 2007 and 2) testimony that Wilson and Nupur were involved in an altercation at a motel where Nupur was staying in March 2007. Coffey did file a motion in limine seeking to exclude this evidence, which the trial court denied because "evidence of prior conflict between the victim and the defendant, as prior confrontation and assaults, is admissible to characterize the relationship between the victim and the defendant to show a motive for committing the crime." Trial App. at 211. Coffey did not object contemporaneously with the admission of the evidence at trial.

Evidence Rule 404(b) provides that otherwise inadmissible evidence of prior wrongs or bad acts may be admissible to prove "motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." In assessing the admissibility of evidence under Rule 404(b), we must determine (1) whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's

---

[10] Because the statements were admissible under the excited utterance exception, we need not address whether they were also admissible as a statement made for the purpose of medical treatment or diagnosis. Moreover, her subsequent similar statements to medical personnel were cumulative. See Gaines v. State, 999 N.E.2d 999, 1005 (Ind. Ct. App. 2013) ("The admission of evidence is harmless and is not grounds for reversal where the evidence is merely cumulative of other evidence properly admitted.").

propensity to commit the charged acts; and (2) whether the probative value of the evidence outweighs the prejudicial effect pursuant to Indiana Evidence Rule 403. Holden v. State, 815 N.E.2d 1049, 1054 (Ind. Ct. App. 2004), trans. denied.

In Spencer v. State, 703 N.E.2d 1053 (Ind. 1999), our supreme court held that the trial court did not abuse its discretion in admitting evidence of prior batteries perpetrated by the defendant against the victim because "where a relationship between the parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime—'hostility.'" Id. at 1056. As for the probative value of the evidence, the court noted that if too much time has passed since the prior conduct, the probative force of such evidence is diminished. Id. The court therefore held that the three years that had elapsed between the time two of the three prior bad acts occurred and the time the charged crime was committed was too long. Id. Here, Wilson said in his statement to police that he and Nupur had been arguing before the fire, and that when Nupur drank, she became argumentative and "wants to put me down and – wants to – just say things to push buttons or whatever." State's Trial Exhibit 73 at page 8; see also id. at page 9 (Wilson stating that he and Nupur had struck each other in the past, but "not like – anything serious."). Wilson's own statements implied a volatile relationship between the parties. The prior bad acts that were admitted occurred within months of the fire. Therefore, the evidence was relevant to an issue other than propensity and had sufficient probative value because Wilson's motive and intent were at issue. See Crain v. State, 736 N.E.2d 1223, 1235-36 (Ind. 2000) (where defendant in murder case

22

"went beyond merely denying the charged culpability and affirmatively presented a claim of particular contrary intent—accidental killing[,]" evidence of prior batteries against the victim were admissible). Therefore, any objection to this evidence would not have been sustained.

Moreover, whether or not the evidence was admissible, the trial court had already ruled on the evidence in pre-trial proceedings. Although a ruling on a motion in limine is not a final ruling on the admissibility of evidence, see Dickey v. State, 999 N.E.2d 919, 921 (Ind. Ct. App. 2013), the trial court had already considered this issue after a hearing at which both parties presented argument in addition to their written pleadings. Wilson has not shown that the evidence as adduced at trial shed any additional or different light on the circumstances which led to the trial court's initial ruling. Given that prior ruling, Wilson has failed to show that an objection on this issue at trial would have been sustained.[11]

### D. Police Testimony

Wilson next contends his trial counsel was ineffective for not filing a pre-trial motion to suppress his statement to police but instead objecting to the statement and asking the detective preliminary questions in front of the jury during his testimony. Specifically, Wilson argues the "failure to litigate the issue of admissibility of Wilson's recorded statements to the police in an appropriate pre-trial context is further proof of his

---

[11] Wilson also briefly mentions at the end of this argument that Coffey should have requested a limiting instruction with respect to this evidence. He does not appear to have raised this issue in his post-conviction petition, alleging only error in counsel's failure to object. See PCR App. at 249. "Issues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal." Allen v. State, 749 N.E.2d 1158, 1171 (Ind. 2001) (citing P-C.R. 1(8)).

23

lack of preparation and his misunderstanding of proper legal procedure." Br. of Appellant at 42. The post-conviction court concluded counsel's performance in this respect was neither deficient nor prejudicial.

First, to prove deficient performance in the failure to file a motion to suppress, Wilson must show that such motion would have been successful. Pace v. State, 981 N.E.2d 1253, 1258 (Ind. Ct. App. 2013). Coffey objected to the admission of the statement at trial and the objection was overruled. Moreover, the admissibility of the statement was raised on direct appeal, and this court held the trial court did not err in admitting the statement. Therefore, the likelihood that a motion to suppress would have been successful is small. Second, to the extent Wilson argues the jury should not have heard some of what was adduced during preliminary questioning—specifically that Wilson asked to speak with his father at the outset of the interview—that same information was part of the statement the jury ultimately heard regardless. And finally, hearing the trial court specifically say the statement was admissible would not likely sway the jury to give more consideration to that particular piece of evidence than any other evidence, as every time an exhibit is offered into evidence, it is admitted by the trial court.

Wilson also argues Coffey should have moved to strike the detective's response to his question about whether or not Wilson was confused when answering questions during the police interview. Specifically, Coffey had been questioning the detective about the various answers Wilson gave during his statement about whether Nupur was standing up or sitting down when the gas was spilled on her:

24

Q: You didn't take that as any kind of confusion in his mind about trying to recollect all this stuff?
A: No, I took it as deceitful.

Trial Tr. at 197-98. Wilson argues this was impermissible opinion testimony in violation of Evidence Rule 704(b). Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." (2013.) "Such testimony is an invasion of the province of the jurors in determining what weight they should place upon a witness's testimony." Bradford v. State, 960 N.E.2d 871, 874 (Ind. Ct. App. 2012) (citation omitted). The detective's statement was not the sort of vouching testimony our courts have found improper. See, e.g., id. at 876-77 (holding social worker's testimony that she had substantiated claims of sexual abuse by the child victim was an improper opinion regarding the truthfulness of the allegations and was reversible error because the State referred to her testimony repeatedly). Moreover, given the context of Coffey's question, the detective did not specifically comment on any of the things precluded by Rule 704(b). Regardless, Coffey may have decided not to object in order to avoid drawing further attention to an answer he sought but perhaps did not expect, which would be a reasonable tactic. See Roberts v. State, 419 N.E.2d 803, 810 (Ind. Ct. App. 1981) (noting counsel "well may have desired to avoid drawing additional attention" to a particular bit of evidence by making objections and requesting instructions which is a trial tactic the reviewing court will not second guess).

E. Prosecutorial Misconduct

Wilson next alleges trial counsel was ineffective for failing to seek a ruling on alleged prosecutorial misconduct. The last thing Coffey said in his closing argument was that "I didn't put a story in Michael's mouth. If I had it would have been better than the one he told, okay? Find him not guilty. Send him home. Thank you." Trial Tr. at 516. The State then began its rebuttal argument:

> [State]: He absolutely put a story in his client's mouth. His client from the beginning keeps changing the facts to meet the evidence.
> [Coffey]: Excuse me, Judge, there is no evidence I put a story in my –
> [Judge]: That what he said you absolutely didn't.
> [Coffey]: Oh –
> [State]: No, he absolutely did . . . .

Id. The post-conviction court concluded Wilson failed to show that the State's comments were misconduct and therefore failed to show that any curative relief requested would have been granted.

Wilson asserts it was unprofessional for the State to allege unethical behavior by defense counsel. Recently, in Ryan v. State, 9 N.E.3d 663 (Ind. 2014), our supreme court held:

> While comments that demean opposing counsel, especially in front of a jury, are inappropriate, not all of the allegedly improper comments here are objection-able. Prosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable.

Id. at 669 (internal quotation marks and citations omitted). The then-prosecutor testified at the post-conviction hearing that he was most likely commenting on the inconsistencies in Wilson's pre-trial statements and trial testimony which Coffey had tried to explain away in his closing. PCR Tr. at 274. That he did so in the terms Coffey himself used

26

was not objectionable.  See Roberts, 419 N.E.2d at 810 (noting that "the failure of counsel to object to improper remarks by the prosecutor is not proof of incompetence.").

## F.  Cumulative Error

Finally, Wilson contends that the cumulative errors by his trial counsel undermine confidence in the jury verdict and warrant post-conviction relief.  The post-conviction court notes that Wilson did not assert cumulative error as a basis for relief in his petition but included such in the proposed findings of fact he submitted to the court.  See PCR App. at 94.  "Errors by counsel that are not individually sufficient to prove ineffective representation may add up to ineffective assistance when viewed cumulatively." Pennycuff v. State, 745 N.E.2d 804, 816-17 (Ind. 2001).  A conviction based upon an accumulation of errors, when counsel's mistakes do substantial damage to the defense, must be reversed.  French v. State, 778 N.E.2d 816, 826 (Ind. 2002).  In Williams v. State, 508 N.E.2d 1264 (Ind. 1987), our supreme court reversed a conviction based upon an accumulation of defense attorney errors, finding counsel for the defendant provided merely perfunctory representation that "graphically portrays a breakdown in the adversarial process which casts substantial doubt on the reliability of [defendant's] trial . . . ."  Id. at 1268.  In Conner v. State, 711 N.E.2d 1238 (Ind. 1999), cert. denied, 531 U.S. 829 (2000), the court again considered a claim of cumulative error and, citing Williams, held that "[s]uch an unusual situation does not exist in this case."  Id. at 1251. As in Conner, we cannot say that counsel's overall representation, although ultimately unsuccessful in procuring a favorable outcome for Wilson, represented a breakdown in

27

the adversarial process that would cast substantial doubt on the reliability of the Wilson's trial.

Conclusion

To prevail on his claim of ineffective assistance of trial counsel, Wilson had the burden to prove to the post-conviction court that his counsel's performance was sub-standard and that the deficient performance prejudiced the defense. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 6 (2003). As to each of the specified claims of deficiency, the post-conviction court made findings and conclusions contrary to Wilson's claim. On appeal from the judgment of the post-conviction court denying relief, Wilson has not demonstrated that the evidence as a whole leads unmistakably and unerringly to a conclusion contrary to the decision of the post-conviction court. The denial of post-conviction relief is affirmed.

Affirmed.

BAKER, J., and KIRSCH, J., concur.