# IN THE COURT OF APPEALS OF IOWA

No. 14-1623
Filed September 23, 2015

**GLENDALE MORE JR.,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Scott County, Stuart P. Werling,

Judge.

        Glendale More Jr. appeals from the denial of his second application for

postconviction relief. **AFFIRMED.**

        Martha M. McMinn, Sioux City, for appellant.

        Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney

General, and Michael J. Walton, County Attorney, for appellee State.

        Considered by Doyle, P.J., and Mullins and Bower, JJ.

**DOYLE, Presiding Judge.**

Glendale More Jr. appeals from the denial of his second application for postconviction relief.  We affirm.

### I.  *Background Facts and Proceedings*.

Following a jury trial in 1984, More was found guilty of first-degree murder.  From the evidence presented at trial, the jury could have found the following facts.

On Sunday, August 28, 1983, just prior to her murder, Wauneita Townsend, a real estate agent, went grocery shopping after hosting an open house.  Approximately forty-five minutes later, she was found dead in her car at a car-dealership parking lot located about ten minutes away from the grocery store.  She had been shot twice, once fatally in the head, and the interior of her car had been set on fire after being doused with paint thinner.  At the time, More was in a romantic relationship with Townsend.

More had been married previously.  While working light construction in southern Illinois, More met and married Bernadette of Golconda, Illinois.  They had a child together, and More adopted Bernadette's other four children.  The couple divorced in 1974, and sometime thereafter, Bernadette moved to Europe.  At about this time, More began working for a railroad, and as part of his job, he traveled frequently.  He met a woman named Norma who lived near Golconda.  He married Norma in 1977, but the marriage only lasted about thirty days.  He remarried Norma in 1979, and they divorced again in 1983.

In approximately 1975, More met Townsend in Bettendorf, Iowa.  More and Townsend began a relationship which lasted about a year.  The two planned

on getting married, but their relationship ended when More moved all of his things from Townsend's home without explanation.

More then began seeing Townsend again in early February 1983, and he stayed with Townsend when he was in the Quad Cities area, which was about fifty-percent of the time. The other fifty-percent of the time, More was in the Golconda area. Although More's second marriage to Norma was dissolved in March 1983, he mainly stayed with Norma's aunt when he was in the Golconda area.

Townsend and More again began talking about getting married. In May 1983, Townsend and More talked to an insurance agent about procuring life insurance policies for each of them. The insurable interest was based upon the fact "[t]hat they were fiancés, that they were going to get married." After shopping around, Townsend and More each purchased $100,000 life-insurance policies from the agent. More paid the initial premiums. Townsend's policy named More as a fifty-percent beneficiary, and Townsend's daughters were named as beneficiaries of the remaining fifty-percent. Townsend was named the beneficiary of More's policy.

More and Townsend then took a trip to the Ozarks. After they returned, More travelled back to the Golconda area and stayed over a week. While there, he visited his children and his family. Bernadette had returned from Europe, and he visited with her also. He and Bernadette were seen together on August 23 or 24, 1983, at a shopping mall near Golconda.

After returning from the trip to the Ozarks, Townsend had lunch with a friend. Prior to the trip, Townsend had told her friend she was not sure if she

should marry More and that the trip "was going to be a chance for her to think it through thoroughly because they would be alone without [her daughters'] influence." At lunch after returning from the trip, about three days before she was murdered, Townsend told her friend, "No, it's not going to work" and she was "going to need some help in telling him."

On the morning of Sunday, August 28, 1983, Townsend and her two teenage daughters attended church. More was expected to return from southern Illinois later that day. After church, Townsend took her daughters to a doughnut shop, and, while there, she told the girls about her life-insurance policy. When finished, she dropped her daughters off at home, and she continued on and hosted an open-house. After the open-house ended, she went grocery shopping.

More returned to the Quad Cities that day, and he met Townsend at the grocery store. He waited in the car "messing with some paperwork" while Townsend shopped. Her sales receipt was time-stamped 4:37 p.m. When she finished shopping, he helped her load the groceries into the trunk of her car. More and Townsend

> chatted shortly, and he kissed her good-bye. [More] said he was going to return back down to somewhere along the road. Between Peoria and Galesburg[, Illinois,] he had seen a sign that said land for sale by owner with a phone number, that when he came up from southern Illinois he had driven past it and he failed to get the number so he was going to return . . . . [Townsend] told [More] she was planning on fixing a big supper so he thought he would take this opportunity to slide down between Peoria and Galesburg to try to get this phone number off this sign and then he would be home in time for supper.
> . . . .
> . . . [T]hey both got in their car[s] and he then drove off the parking lot.

Townsend's car was discovered on fire around 5:25 p.m. in a car-dealership parking lot approximately ten minutes from the grocery store.

Around 5:45 p.m., More was stopped by an Illinois State Trooper. More was driving on eastbound Interstate 74 near Woodhull, about 30 miles south of the Quad Cities, when the trooper clocked More driving 73 miles-per-hour in a 55 mile-per-hour zone. The trooper spoke with More, and More told him "he was up in . . . the Quad Cities area looking at prospective construction work," stating he was "[i]nto construction work or buildings." The trooper issued More a ticket at 5:45 p.m.

Around 7:40 p.m., More called Townsend's home collect from a pay phone at a gas station located near Peoria. Townsend's fourteen-year-old daughter accepted the call and told More Townsend had not come home yet. More remarked that it was not like her not to call. He did not mention he had seen her a few hours earlier. He told Townsend's daughter he was having car problems but would "be home probably [in] about an hour and a half or two." More arrived at Townsend's home around 9:30 p.m. Only Townsend's teenage daughters were there. Even though Townsend's car was not parked in its usual spot in the driveway, More asked, "Is your mother home yet?" He asked, "[H]ad she called or anything?" Again, he did not volunteer that he had seen her earlier that day.

He and the girls watched television for a bit, when a news flash came on showing a car and announcing a Bettendorf woman had been killed. Townsend's daughter immediately recognized the car as her mother's, and More called the police station. More spoke with a detective working on the case around 9:40 p.m., and the detective confirmed that it was Townsend's car and that she

was inside and was dead. More told the girls the horrible news while on the phone. The detective asked More to come down to the police station so the officers could gather some information. More did not want to go, but he ultimately agreed. After family members and others had been called and arrived at the house, More left for the police station.

At the police station, More told the officers he had returned to the Quad Cities that day, after visiting an ex-wife in southern Illinois. He said he encountered Townsend at a stoplight. They had a short conversation and she said she was going to go grocery shopping. More followed her to the grocery store. He said he waited in the lot going over some paperwork while Townsend shopped inside. He told officers that when she returned he helped her load the groceries into the trunk of her car. They went their separate ways, and "he assumed she was going home since she had perishable items." He told the officers he immediately headed out of town after leaving the grocery store. He told the officers he then had car trouble. He said he arrived at Townsend's home between eight and nine o'clock that night. An officer asked More "if he had checked the refrigerator for [the perishable items Townsend had purchased at the store], and he said he didn't. He said that wasn't any of his business." The officers stepped out of the interview room thereafter, and at that time, More came out of the room and told the officers he was having heart trouble. An ambulance was called, and More was rushed to an emergency room.

During transport in the ambulance, More told the technicians "the chest pain had gone away, and then stopped talking to anyone in the ambulance and the emergency room from then on, so [the emergency room physician] was not

able to obtain a history from him." The physician performed an examination of More but found no physical abnormalities. The physician related this to More, but More "continued to just lie on the exam cart with his eyes closed not responding to anyone." Because More "was not able or willing to leave the emergency room," the doctor "thought it best to have him admitted to the hospital" since it appeared More "was not able to take care of himself." The doctor sought and received a court order committing More to the psychiatric unit of the hospital. A nurse then went through his clothing to "make sure there [were] no sharp articles or anything that [could] be used to hurt himself" or others. While emptying More's pants pockets, the nurse found a .38 caliber cartridge,[1] and she turned the round over to an officer.

In the early morning of August 29, 1983, the psychiatrist on call examined More. He found More

> was presenting with a gross movement problem in that he was not talking, and participating only limitedly with the examiners. Examining him, [the psychiatrist] could find nothing wrong physically other than some findings he has with the absent lower leg . . . , but there was no sign of any physical disease . . . . Also, in examining him, trying to understand what happened, it appeared . . . [More] was producing voluntarily some very exaggerated symptoms which seemed to [the psychiatrist] understandable in view of the circumstances. [The psychiatrist] couldn't find any evidence of a psychotic disorder . . . . [The psychiatrist] could not seem to come up with any findings that were consistent with understanding him in terms of some psychology; rather, it appeared to [the psychiatrist] that this was voluntarily

---

[1] The nurse referred to the item as a "bullet." As Federal Bureau of Investigation (FBI) agent William Albrecht, a firearms specialist, explained at trial:

> [T]he bullet . . . is the lead component . . . [that] passes down the barrel of the weapon. That's the bullet. The cartridge case, which is frequently referred to as the shell, is . . . the shiny part. That's what contains the powder and is the part in which the bullet is seated . . . . [T]he bullet is seated on the top of the cartridge case. Together it is all referred to as a cartridge.

produced and it was understandable in view of the circumstances, and [the psychiatrist] just couldn't find any evidence of a serious nervous disorder.

More "responded some initially and with an increasing amount during the twenty-four hours or so" that he was in the psychiatric unit. After the psychiatrist "talked with [More], telling him . . . his former wife . . . was there, . . . there were no charges against him," and as soon as the hospital could arrange his ex-wife to "come up and get him . . . he could leave the hospital," More "appeared to recover from what was happening." More "expressed his relief about that" and "had a very short conversation" with the psychiatrist, telling the doctor he did not want to stay, and More was subsequently discharged on August 30, 1983.

More was picked up at the hospital by Bernadette and a cousin. However, officers were waiting outside the hospital and asked More to come to the police station. More was again interviewed by detectives, and he gave basically the same responses he had previously given. However, More was asked "two different times during this interview if he would receive any type of benefit from [Townsend's death], and he stated definitely not" and denied he was a beneficiary. A detective advised More of his suspicions, and More told the detective he wanted to end the conversation. More stormed out, telling the detectives that if they wanted him, he would "be in the Vet's Hospital in Illinois."

Bernadette, More, and More's cousin then left the state, driving to southern Illinois. More and Bernadette checked into a motel in Paducah, Kentucky. More listed his address as being Rosiclare, Illinois, a town near Golconda and Paducah, and the desk clerk questioned More about this because the motel did not "rent to locals." More told the clerk he had several different

addresses and had just got back from Europe. The clerk allowed him to stay. More introduced the clerk to Bernadette as "his wife." They stayed two nights in the motel. More did not attend Townsend's funeral, and he did not contact her children for some time, calling just once from "somewhere in Illinois and . . . want[ing] to find out how [they] were doing."

A warrant was issued for More's arrest on September 16, 1983. More, "[o]n the advice of [his] attorney in [the Golconda] area, . . . was [going] to try to go back to work and try to get some activity in [his] life that [he] could hold on to." More drove through Tennessee and down into Florida. He drove to Miami and spent a few days. He "came back up through Gulf Breeze; on around the Gulf Coast; over through Texas; up through Colorado and Wyoming into Montana." In Red Lodge, Montana, at the end of September 1983, More was located at a motel. His car was completely full and loaded down, with only room for a driver. Items found in his car included camping items, clothes, suitcases, maps, tools, personal papers, and a bullet-proof vest. More was told by law enforcement officials that there was a warrant out for his arrest, and "he acknowledged, you know, yeah, as if he knew that he was wanted." More was arrested and returned to Iowa, and he was charged with first-degree murder.

Townsend's residence was searched by law enforcement officers for evidence on August 29, 1983. In the bedroom which was used by More, over a dozen rifles and shotguns were found. In addition to the rifles and shotguns, several assorted handguns were also found in the home, including a Ruger .357 magnum revolver and a Colt .38 caliber Diamond Back revolver. A wide variety of ammunition and shooting supplies were also found in the house.

An autopsy was performed on Townsend, and a bullet and lead shavings were recovered from the right side of her skull. Four latent fingerprints were developed on the exterior of the back of Townsend's car which matched More's fingerprints. A pop can, found in a litter bag in the car, also bore one of More's fingerprints. Additionally, a full lead .38 caliber bullet was found in the headliner of the car above the windshield on the driver's side of the car. The interior of the "car smelled of some type of an accelerant," and a white, partially-melted container with the words "Paint Thinner" on it was found in the front-seat area.

A jury trial commenced in February 1984, and the information related above was substantively adduced at trial. Additionally, a thirteen-year-old witness, Jeremy Elmore, who was under the jurisdiction of the juvenile court, testified on behalf of the State that he saw More at the crime scene. Specifically, Elmore testified:

> that in the afternoon of August 28, 1983, he was casing [a car dealership's] parking lot . . . near where the victim's body was found . . . . Elmore testified he was planning to steal a car when he heard two big booms and saw a man get out of a white car, walk to another car, take out a white container, put it inside his shirt, and pour fluid from the container's contents inside the white car. Elmore said he next saw the man ignite the inside of the car. Elmore testified he slipped, made a noise, and the man shined a flashlight under cars looking for him before walking away . . . .
>      . . . .
>      Elmore . . . testified that several days after he saw the man pour fluid on the white car he heard a woman had been murdered [in the dealership's] parking lot that day. He said he spoke to his juvenile court officer in Burlington and later talked to [police detectives]. Elmore described the incident he allegedly saw and related the man he saw walked with a limp, had dark hair, and wore a red or maroon shirt and blue jeans . . . . At trial, Elmore identified More as the person he saw in the parking lot.

*See More v. State*, No. 98-74 (Iowa No. 9-081), op. at 2, 6, 7 (Iowa Ct. App. April 30, 1999) (hereinafter *More II*). On cross-examination, Elmore's testimony was attacked "by (1) his status as a juvenile offender on probation; (2) his testimony he observed the crime while he was contemplating stealing a car; and (3) his failure to identify More at the line-up and at a pre-trial deposition." *Id.*

Law enforcement officers had requested the FBI Laboratory examine several items of evidence collected in their investigation, including guns seized, bullets, lead shavings, clothing, and other materials, and the two FBI agents who conducted the examinations testified. Agent William Albrecht, a firearms identification specialist, analyzed the bullets recovered from the car's headliner and the autopsy. He determined both bullets were .38 caliber and that both bullets were fired from a weapon of the same kind, but he was unable to determine whether the bullets were fired from the same barrel. Agent Albrecht testified the cartridge, found in More's pants at the hospital, was a .38 special caliber manufactured by Federal Cartridge Corporation based upon the mark or stamp appearing on the base portion of the cartridge case. He compared the cartridge to the fired bullets recovered, and he testified his findings regarding the cartridge were "consistent with [his] findings with respect to caliber and manufacturer for [the fired bullets]." He testified two different caliber gun types could accommodate a .38 special caliber cartridge: a .357 magnum or a .38 special. In the .357 magnum category, there were two potential gun manufacturers: Ruger and Smith and Wesson. Agent Albrecht examined More's .357 magnum caliber Ruger seized from Townsend's home, and he determined the lands and grooves of this weapon did not match the lands and grooves found

on the fired bullets. Additionally, the agent examined More's clothing for the presence of gunpowder residue. He testified he was unable to make a finding in that regard.

The second FBI agent, Roger Asbury, testified concerning bullet composition. Agent Asbury was part of the Elemental Analysis Unit of the FBI Laboratory and specialized in neutron activation analysis. The agent testified he examined the two fired bullets recovered from the scene and autopsy, along with the bullet portion of the unfired cartridge found in More's pocket, and determined the three bullets matched in composition. He opined that because of the match, the three bullets "certainly could have originated from the same box of cartridges due to their composition. It would be what [he] would expect to find among bullets originating from the same box of cartridges." He also examined the bullet portions of cartridges seized from Townsend's home. He determined the bullet components of the cartridges were observably different from the fired bullets and could not have come from the same ammunition box.

Agent Asbury was subject to an intense cross-examination, and he admitted Federal Cartridge Corporation was a major ammunition manufacturer whose ammunition was found throughout the Unites States. Additionally, More presented his own expert witness, Dr. Steve Morris. Dr. Morris, the group leader for neutron activation analysis at the University of Missouri, testified the FBI was in the minority of testing bullet-lead composition to determine if the bullets "match" because neutron activation analysis was not a suitable technique for that purpose. He explained that only three elements could be tested leading to "only

two points of comparison," which was "at least a factor of five too few to use to compare to items with respect to common origin."

Several witnesses testified concerning More's gun ownership and conversations they had with More about guns. One deputy sheriff from the Golconda area testified that he and More had had discussions about guns and the merits of their weapons, and he had even purchased a gun from More. Related to the case, the deputy testified he himself had a Ruger .357, and he would tease More that his Ruger was better than More's Smith and Wesson .357. Though the deputy never saw a Smith and Wesson .357, he was positive More represented to him that he owned the gun. A carpet salesman testified he saw More's large handgun and though he did not remember its manufacturer, he did not believe it was the same as More's .357 Ruger seized from Townsend's home. More's insurance salesman testified the handgun More showed him was a chrome-plated gun with pearl handles, but he did not remember the make of the gun and was not positive of the caliber, but thought it was a .357 or .38. Townsend's co-worker testified More showed him his .357, but he did not know if it was the same as More's .357 Ruger seized from Townsend's home.

Two officers testified about their tests to determine the time and distance it would take a person to drive from the grocery store to the parking lot where Townsend's car was found, as well as the time it took to drive from the grocery store to mile-marker 29 on Interstate 74. The tests were performed, taking various routes and timed by two stopwatches, driving the speed limit and obeying all traffic ordinances. It was about ten minutes from the grocery store to the car

dealership. From the grocery store to mile marker 29 on Interstate 74, the longest run time for the 42.9 miles was 52 minutes and 48 seconds.

More testified at trial and denied killing Townsend. More had engaged in a variety of activities during his career. He was a licensed firearms dealer, licensed to buy and sell firearms. He was involved in the erection of pole buildings and grain bins. He was a heavy equipment operator for the railroad. He was in the rare gem business, buying and selling "gems, diamonds, rubies and et cetera." He routinely carried a gun for protection. He dabbled in real estate, buying and selling property, and owned several rental properties.

In September 1980, More lost his left leg in a hunting accident. He has since used a prosthesis and walks with a limp. In approximately 1981, More received a settlement related to his hunting accident of approximately $45,000. More deposited the settlement proceeds into a bank near Golconda, putting the funds into certificates of deposit (C.D.'s), which he borrowed against from time to time. He also received a monthly disability stipend of about $1000 from "insurance that [he] carried for some years for the loss of [his] leg."

In 1982, More was in a motor vehicle accident. His vehicle went over an embankment. A bottle of eighty-percent sulfuric acid that was in his car ruptured and spilled on him causing him to suffer severe burns on his right foot. Around the same time, More received insurance proceeds of approximately $19,000 after one of his rental properties burned, allowing him to pay off the $5000 mortgage on the property. In early 1983, his bank requested he pay on some of the promissory notes he had with the bank, and More cashed in his C.D.'s and paid off most of his loans. However, his loans exceeded the value of his C.D.'s, and a

few unsecured loans he had left were getting delinquent. In July 1983, More learned his supply of fluorspar[2]—which he valued in excess of $300,000—was destroyed in a fire after the warehouse where it was stored burned down. On August 1, 1983, More borrowed $3500 against his car.

More testified he immediately left the Quad Cities after seeing Townsend at the grocery store. He did not dispute the times stated on the grocery receipt or his speeding ticket. He testified it was possible the nurse had found a bullet in his pocket, but he had "no idea" where it came from or how it got in his pocket.

He testified he did not attend Townsend's funeral because he "didn't know when the funeral was taking place," and he was "very apprehensive as to the law enforcement officers that had been questioning [him]. I was scared." He testified when he left southern Illinois and drove to Florida, he did not know a warrant had been issued for his arrest. He denied telling the desk clerk at the Paducah motel he had been in Europe. More admitted he had received money from insurance companies in the past, but he testified he could not confirm or deny that he had recovered from insurance companies at least $175,000 since 1977, not counting amounts paid directly to hospitals or doctors on his behalf.

More was found guilty as charged. *See State v. More*, 382 N.W.2d 718, 720 (Iowa Ct. App. 1985) (hereinafter *More I*). More appealed the conviction, arguing, among other things, the trial court erred in admitting the testimony of the two physicians and nurse that saw him on August 28 to 30, 1983. *See id.* at 720-22. More asserted his communications to the doctors and nurse, or more

---

[2] Fluorite, also called fluorspar, is "a transparent or translucent mineral of different colors that consists of calcium fluoride and is used as a flux." Webster's Seventh New Collegiate Dictionary 322 (1967).

accurately, his *lack* of verbal communication with them, was privileged communication that fell under the doctor-patient relationship. *See id.* This court agreed, finding the "testimony . . . was privileged and should not have been admitted. It was prejudicial in that it very likely hurt [More's] credibility in the eyes of the jury." *Id.* at 722-23. However, we found it was not reversible error, explaining:

> The State produced evidence of [More's] fingerprints on the outside of the car in which the victim was found. A bullet found on [More] matched the bullet used to kill the victim. An eyewitness testified that he heard "two booms" and, shortly thereafter, saw a man use a white container to spread something around the car and light it on fire. The witness testified that the man had a noticeable limp and identified him as [More].
>
> [More] relied on an alibi defense and yet could not overcome circumstantial evidence to the contrary. Also, evidence of [More's] actions after the time of the victim's death, his strange interaction with the victim's children, and the suspicious circumstances surrounding his cross-country travels and eventual arrest in . . . Montana, adds to the conclusion that [More] did in fact commit the murder. Therefore, in light of the overwhelming evidence of defendant's guilt, the admission of privileged medical testimony is harmless error.

*Id.* at 723. Consequently, we affirmed his conviction. *See id.*

In February of 1997, Elmore recanted his trial testimony. *See More II*, op. at 3. Elmore testified

> he was never at the parking lot the day of the alleged murder. He stated he never saw More at the parking lot and had no information regarding the murder. Elmore testified on the day in question he had cashed in a bus ticket given to him by his grandmother and spent the day drinking alcohol with persons he referred to as "bums" near the Davenport levee. He stated most of the information he had about the case was obtained through newspapers and the police. Elmore further stated he was told by the Davenport police he would likely receive a reward but not to mention it to anyone. He testified the police told him where More would be sitting at trial.

*Id.* at 7-8.  More subsequently filed an application for postconviction relief (PCR), asserting the State suppressed evidence violating his right to a fair trial and that Elmore's recantation was newly-discovered evidence entitling him to a new trial. *See id.* at 2.  One of the detectives in the case testified thereafter:

> [P]rior to More's trial [the detective] requested Iowa Arson Alert give Elmore a cash reward for testifying against More and he told Elmore that to get the reward he had to testify.  A month after trial, the check that was Elmore's reward was made out to [the detective, and he] . . . gave the check to Elmore's probation officer, who gave it to Elmore.  [The detective] testified after Elmore was notified he was getting the money, he was able to identify More.

*Id.*  The State did not disclose to More that Elmore received the reward, and Elmore denied in his pre-trial deposition there was a reward.  *See id.* at 2-3.  More's trial counsel testified that this information would have made a difference in his cross-examination.  *Id.* at 3.

The PCR court denied More's application.  *See id.* at 5.  The court "discounted Elmore's recantation, finding it 'completely incredible'" and "precipitated by Elmore's encounter with More while in prison at Fort Madison." *Id.* at 8.  The court further found: "(1) Elmore's trial testimony was consistent with an earlier statement; (2) Elmore gave information not known to the public; (3) Elmore was impeached with other evidence, and (4) even excluding Elmore's testimony, the evidence establishing More's guilt was strong."  *Id.* at 5.

More appealed the PCR court's ruling, and we affirmed.  *See id.* at 9.  We agreed with More that the State had suppressed impeachment evidence that was relevant to his defense, noting the "fact Elmore had an incentive to testify goes to the issue of the credibility of his testimony."  *Id.* at 4.  However, we agreed with the PCR court that More could not show "that had Elmore's testimony been

further impeached by the fact he was receiving a $300 reward, there [was] a substantial probability More would not have been found guilty." *Id.* at 7. We reasoned Elmore's testimony was substantially attacked at trial, and "there was substantial evidence connecting More to the crime," stating:

> The record shows the victim was engaged to be married to More and had told a friend a short time before the murder it was not going to work out . . . . More went to the police station on the night of the murder to talk to police. He was taken to the hospital claiming angina. A bullet that had not been fired was found in his pocket. Using a neutron activation analysis, the bullet was found to have been manufactured and packaged in the same box and on the same day as the bullets found in the victim's body and in her car. More's fingerprints were found on the outside of the car. More admitted he saw the victim at 4:30 p.m . . . . . More purchased a $100,000 life-insurance policy on the victim three months before her death naming himself beneficiary of $50,000 of the insurance. More testified in his own behalf and presented an alibi defense which was discounted by the State's evidence.

*Id.* at 6-7. Additionally, we deferred to the PCR court's conclusion that Elmore's recanted testimony was not credible and would not change the results of the trial, finding the conclusion reasonable and explaining:

> Elmore's initial statement to the police included references to facts of the case not known to the public, including (1) the man he saw walked with a limp and More walked with a limp; (2) a description of the paint thinner can in the victim's car; and (3) a description of More's car.

*Id.* at 8-9. We therefore affirmed the PCR court's denial of More's PCR application. *Id.*

"In 2002, the FBI asked the National Research Council (NRC) of the National Academy of Science to have an independent committee of experts evaluate the scientific basis of comparative bullet lead analysis [(CBLA)]." Press Release, FBI, *FBI Laboratory Announces Discontinuation of Bullet Lead*

*Examinations* (Sept. 1, 2005) [hereinafter *Press Release*].[3]  Following the study,

"[t]he NRC expressed concerns . . . relating to the interpretation of the results of

bullet lead examinations."  *See id.*  Specifically, the NRC found:

> The available data do not support any statement that a crime bullet came from, or is likely to have come from, a particular box of ammunition, and references to "boxes" of ammunition in any form are seriously misleading under Federal Rule of Evidence 403. Testimony that the crime bullet came from the defendant's box or from a box manufactured at the same time, is also objectionable because it may be understood as implying a substantial probability that the bullet came from [the] defendant's box.

Nat'l Res. Council, *Forensic Analysis: Weighing Bullet Lead Evidence*, 113

(2004).[4]  Based upon the NRC's findings, the FBI Laboratory decided that

although it "still firmly support[ed] the scientific foundation of bullet lead analysis,"

it would no longer conduct bullet lead examination, "given the costs of

maintaining the equipment, the resources necessary to do the examination, and

[the examination's] relative probative value."  *See Press Release*.  Because of its

decision to discontinue bullet-lead examinations, letters were "sent to

approximately 300 agencies that received laboratory reports indicating positive

results since 1996 . . . so that these agencies may take whatever steps they

deem appropriate, if any, given the facts of their particular case."  *Id.*  The FBI

Laboratory pointed out that it had "not determined that previously issued bullet

lead reports were in error."  *See id.*

In 2007, More filed a second application for PCR after learning of the FBI's

change in policy.  More asserted:

---

[3] Available at http://www.fbi.gov/news/pressrel/press-releases/fbi-laboratory-announces-discontinuation-of-bullet-lead-examinations (last visited Sept. 4, 2015).

[4] Available at http://www.nap.edu/catalog/10924/forensic-analysis-weighing-bullet-lead-evidence (last visited Sept. 4, 2015).

It has now been revealed that testimony concerning bullet lead analysis . . . is false and that the fact that bullet lead is compositionally indistinguishable does not mean that the bullets came from the same source or were made on the same day. It has now been further established that the [FBI] lacked sufficient data to determine the likelihood that two bullets allegedly having the same composition came from the same source. The [FBI] was aware at the time of the testimony in this case that there was no scientific validity to the claims made in the testimony of [the examiner].

More alleged the FBI Laboratory's changed position constituted newly discovered evidence, and he requested his conviction be vacated and a new trial be ordered.

The county attorney followed up with the FBI Laboratory, and the Laboratory reviewed the their agents' testimony at More's trial on the subject of CBLA to determine if the examiner suggested in his testimony "that a bullet fragment or shot pellet was linked to a single box of ammunition without clarification that there would be a large number of other bullets or boxes of bullets that could also match those fragments or shot pellet." In 2009, the Laboratory opined "the examiner did state or implied that the evidentiary specimen(s) could be associated to a single box of ammunition. This type of testimony exceeds the limits of the science and cannot be supported by the FBI."

It appears there was no further action on More's PCR application until approximately 2011, when More's PCR counsel entered her appearance. More subsequently filed a motion for summary disposition and a memorandum in support thereof, asserting he was entitled to a new trial "because the only direct evidence linking [him] and the crime for which he was convicted is now known to be false or mistaken." The State resisted and argued "[t]here was ample evidence for the jury to find [More] guilty of this murder without the comparison of

bullet lead analysis testimony." In June 2011 the PCR court entered its ruling denying More's motion, finding genuine issues of material fact existed.

The case lingered again until August 21, 2014, when More's PCR counsel requested a judge be assigned to the case. On September 2, 2014, the PCR court entered its ruling denying and dismissing More's second PCR application. In reviewing the evidence produced at trial, the PCR court found:

> Based on the totality of evidence before the jury at trial other than the now discredited CBLA testimony, the court finds that the inadvertently inaccurate CBLA evidence presented at trial was not sufficient to deny [More] a fair trial. Accordingly, a reasonable jury could conclude that More was guilty beyond a reasonable doubt based on the totality of the evidence before them, regardless of the CBLA evidence.

More now appeals.

## II. Scope and Standards of Review.

"Generally, an appeal from a denial of an application for postconviction relief is reviewed for correction of errors at law." *Perez v. State*, 816 N.W.2d 354, 356 (Iowa 2012) (citation and internal quotation marks omitted). However, to the extent More asserts constitutional claims, "our review is de novo in light of the totality of the circumstances and the record upon which the [PCR] court's rulings were made." *Id.* (citation and internal quotation marks omitted).

## III. Discussion.

On appeal, More argues the admission of the FBI agent's testimony, that the cartridge More had in his pocket came from the same ammunition box as the spent bullets recovered from the scene and the victim, wrongfully impeached More's credibility, denied him a fair trial, and violated his due process rights. The State responds the FBI merely made a change in policy that did not constitute

newly discovered evidence, but in any event, the exclusion of the testimony or further impeachment of the agent would not have changed the outcome of the trial. The State also argues admission of the CBLA evidence did not violate More's due process rights.

### A. Newly Discovered Evidence.

Since More was convicted in 1984, his 2007 PCR application would appear to be untimely on its face because Iowa Code section 822.3 (2007) requires that PCR applications "be filed within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued." However, the "limitation does not apply to a ground of fact or law that could not have been raised within the applicable time period." Iowa Code § 822.3; *see also Harrington v. State*, 659 N.W.2d 509, 515, 520-21 (Iowa 2003). More suggests the newly discovered evidence, that CBLA is junk science, was not available at the time of trial. The State counters More's claim regarding the CBLA testimony is not newly discovered evidence because the evidence was essentially available at the time of his trial. Nevertheless, the State concedes it did not assert More's application was untimely pursuant to section 822.3 before the PCR court, and it does not, nor can it, raise the issue here. *See DeVoss v. State*, 648 N.W.2d 56, 63 (Iowa 2002) (holding substantive or procedural issues raised for the first time on appeal will not be considered, even if the issue "might be the only ground available to uphold a district court ruling"). Accordingly, we address the issue on its merits.

### B. *Fair Trial and Due Process.*

More argues, "because the bullet lead analysis falsely told the jury that [More] had ammunition which came from the same box as the murder bullets, and because it wrongfully impeached [More's] credibility, [More] was denied a fair trial," and admission of the evidence violated his due process rights. Article I, section 9 of the Iowa Constitution provides in pertinent part that "no person shall be deprived of life, liberty, or property, without due process of law." This constitutional provision "is parallel to a similar provision of the Fifth and Fourteenth Amendments of the United States Constitution." *King v. State*, 818 N.W.2d 1, 66 (Iowa 2012); *see also* U.S. Const. amends. V, XIV. "Although we jealously guard our ability to interpret the Iowa Constitution differently than the interpretations of the United States Supreme Court under the federal due process provision," *see King*, 818 N.W.2d at 65, neither the State nor More suggest or offer any reasons for a separate analysis, and we therefore resolve More's state and federal due process claims under the existing federal standards. *See State v. Dewitt*, 811 N.W.2d 460, 467-68 (Iowa 2012).

"Due process requires fundamental fairness in a judicial proceeding"; consequently, in order to satisfy due process, a defendant's trial must not have been fundamentally unfair. *State v. Becker*, 818 N.W.2d 135, 148 (Iowa 2012) (citation and quotation marks omitted). In order to receive a new trial based on newly discovered evidence, an applicant must establish, among other things, "that the evidence is material to the issues in the case and not merely cumulative or impeaching" and "that the evidence probably would have changed the result of the trial." *Harrington*, 659 N.W.2d at 516. The applicant is not required to prove

the evidence would have resulted in his acquittal. *See id.* at 523. Stated another way:

> [T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)). Thus, we must "consider the totality of the circumstances, including the possible effects of . . . defense counsel's trial preparation," in determining whether our confidence in the verdict is undermined. *Id.* at 523-24 (citation and internal quotation marks omitted).

Upon our de novo review of the record and consideration of the totality of the circumstances, our confidence in the soundness of More's conviction is not significantly weakened by Agent Asbury's testimony and the discredited CBLA evidence. Although courts in a few jurisdictions have reversed a defendant's conviction based only on the fact that there was erroneous CBLA testimony admitted at trial, most PCR courts,

> especially when on collateral appeal through a habeas corpus motion, . . . have not found the use of [CBLA] evidence sufficiently problematic to warrant overturning a conviction. These courts often emphasize that sufficient other evidence pointing to defendant's guilt makes the newly recognized weaknesses in the [CBLA] evidence insufficient to show that its exclusion, or its more effective impeachment, would have changed the results of the trial.

4 David L. Faigman, Mod. Sci. Evidence: The Law and Science of Expert Testimony, *Cases Before and After the NRC Report* § 36:2 (2014-15 ed.); *also compare Ragland v. Commonwealth*, 191 S.W.3d 569, 582 (Ky. 2006)

(overturning murder conviction where CBLA evidence was the only conclusive evidence linking defendant to the murder bullet); *Kulbicki v. State*, 99 A.3d 730, 743 (Md. 2014), *petition for cert. filed*, ___ U.S. ___, (U.S. Jan. 16, 2015) (No. 14-848) (granting new trial because "there was a 'substantial possibility' that the outcome would have been different had Kulbicki's counsel questioned [the FBI agent] regarding the possibility of having compositionally similar bullets exist in different batches," given "the State's rigorous reliance on CBLA evidence to connect Kulbicki to the crime"); *State v. Behn*, 868 A.2d 329, 345 (N.J. Super. Ct. App. Div. 2005) (granting new trial where the proof was "far from overwhelming" and the CBLA evidence was not cumulative or merely impeaching), *with United States v. Higgs*, 663 F.3d 726, 738-42 (4th Cir. 2011) (finding the CBLA evidence merely corroborated other evidence of guilt); *United States v. Chalan*, 438 F. App'x 710, 713 (10th Cir. 2011) (finding that even if the admission of CBLA testimony was error, the error did not influence the jury's verdict); *United States v. Berry*, 624 F.3d 1031, 1041 (9th Cir. 2010) (rejecting claim based upon admission of CBLA evidence because studies did not "establish that [CBLA] evidence is so fundamentally unreliable that its introduction at Berry's trial violated his due process rights"); *In re Berkley*, 375 F. App'x. 413, 415 (5th Cir. 2010) (denying request to file successive application for habeas relief from capital conviction based upon CBLA criticism because, even assuming that the petitioner could not have discovered the flaws in the CBLA evidence through the exercise of reasonable diligence, he failed to show "that but for the flawed bullet analysis, no reasonable factfinder would have found him guilty of capital murder"); *United States v. Davis*, 406 F.3d 505, 509 (8th Cir. 2005) (affirming

court's finding that trial counsel was not ineffective because Davis's expert provided testimony challenging the FBI agent's CBLA conclusion that the bullets were a match); *Wyatt v. State*, 78 So. 3d 512, 527 (Fla. 2011) (finding that CBLA studies constituted newly discovered evidence but affirming the denial of PCR because defendant did not show evidence would probably produce an acquittal on retrial); *Dickens v. State*, 997 N.E.2d 56, 61 (Ind. Ct. App. 2013) ("Although the exclusion of the CBLA evidence might have weakened the State's case, Dickens has not shown that the exclusion of the CBLA evidence, without more, would make it probable that a different result would be produced at retrial."); *St. Clair v. Commonwealth*, 451 S.W.3d 597, 617-18 (Ky. 2014) (finding there was no "reasonable certainty" the verdict would be different if CBLA evidence was excluded at new trial); *Commonwealth v. Lykus*, 885 N.E.2d 769, 783-84 (Mass. 2008) (reversing lower court's grant of new trial, finding Lykus's "effort to minimize the vast body of circumstantial evidence as 'equivocal at best,' . . . totally unpersuasive," including CBLA testimony); *Scott v. State*, 788 N.W.2d 497, 502 (Minn. 2010) (finding that studies discrediting CBLA evidence did not establish Scott's innocence by its clear and convincing standard); *Commonwealth v. Fisher*, 870 A.2d 864, 870-72 (Pa. 2005) (Fisher's evidence of CBLA studies did not "establish, by a preponderance of the evidence . . . that such evidence would likely compel a different result").

Here, Agent Asbury's opinion interpreting the CBLA results concerning whether the bullets matched was not definitive; his opinion was couched in terms of "could have" and "what [he] would expect." Moreover, his testimony was subject to vigorous cross-examination, and More presented his own expert

challenging Agent Asbury's opinion. We agree with the PCR court: "Based on the totality of evidence before the jury at trial other than the now discredited CBLA testimony, the court finds that the inadvertently inaccurate CBLA evidence presented at trial was not sufficient to deny [More] a fair trial."

In light of all the other evidence presented to the jury, the exclusion of Agent Asbury's opinion and the CBLA testimony, the exclusion of the testimony of the doctors and nurse (as referred to in *More I*, 382 N.W.2d at 722-23), and the addition of further impeachment of Elmore (as referred to in *More II*, op. at 7) would not have changed the results of the trial. More admitted he was with Townsend shortly before she was murdered when he assisted her in loading groceries into the trunk of her car at the grocery store parking lot. His hand prints were found on the hatchback of Townsend's car; consistent with More having closed the hatchback after loading the groceries. He testified they left in separate vehicles. Shortly after Townsend's body was found in her burned-out car, More was stopped and charged with speeding. When he was stopped, he was headed away from the crime scene driving 73 in a 55 mile-per-hour zone. The timing and location of his stop was consistent with the time it would have taken him to leave the grocery store, lure an unsuspecting Townsend to the car lot ten minutes away, shoot her, light her car on fire, and drive out of town. He told the trooper that stopped him for speeding that he was looking for work. On the other hand, he told investigating officers when he left the grocery store he was going to look for a real-estate sign.

Additionally, More was found with a cartridge in his pocket of the same caliber and type that was recovered from the car and Townsend's body. More's

testimony that he had no idea how the cartridge got in his pocket is simply not credible, regardless of all the other evidence damaging his credibility. More initially denied he had any financial gain on account of the death of Townsend. It was later discovered that he was the beneficiary of a newly-purchased $100,000 life-insurance policy, of which he would receive $50,000. Although More was with Townsend shortly before she was murdered, he did not tell her children that night about his seeing her earlier in the day. More did not attend Townsend's funeral despite their marriage plans. More had been seen fairly regularly with his ex-wife Bernadette before Townsend's murder, and after the murder she was the one who picked More up at the hospital and stayed with him at a motel. More introduced Bernadette as his wife to the desk clerk.

Finally, More constantly carried a gun, generally a .357, and witnesses' testimony evidenced he owned a .357 Smith and Wesson, which was not found after the murder.

The body of circumstantial evidence is significant and sufficient so that a reasonable juror could have found proof beyond a reasonable doubt that More murdered Townsend. Our courts have often said that circumstantial evidence is equally as probative as direct evidence. S*ee State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011); *see also State v. Liggins*, 557 N.W.2d 263, 269 (Iowa 1996) ("A jury is free to believe or disbelieve any testimony as it chooses and to give as much weight to the evidence as, in its judgment, such evidence should receive.").

Furthermore, Elmore, the eye-witness, testified he heard two big booms and saw a man, he later identified as More, get out of Townsend's car. He observed the man walk to another car, take out a white container, put it inside his

shirt, and pour fluid from the container inside Townsend's car. He saw the man ignite the inside of the car. Elmore was vigorously impeached at trial. Exclusion of Agent Asbury's opinion, along with exclusion of the testimony of the doctors and nurse, and the addition of further impeachment of Elmore's testimony concerning the fact he was receiving a $300 reward, does not paint the case in such a different light that our confidence in the verdict is undermined. Accordingly, we believe a reasonable jury could conclude that More was guilty beyond a reasonable doubt. More failed to establish his constitutional rights to a fair trial and due process were violated.

### IV. Conclusion.

For the foregoing reasons, we affirm the PCR court's denial of More's second PCR application.

**AFFIRMED.**